NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 170326-U

NO. 4-17-0326

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 23, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JUSTIN R. ROOF, | ) | No. 16CM1629 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Lee Ann S. Hill, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed defendant's convictions and sentences, finding: (1) the trial court's improper admonishment pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) did not constitute plain error because the evidence against defendant was not closely balanced; (2) defense counsel did not provide ineffective assistance; and (3) defendant's convictions do not violate the one-act, one-crime rule.

¶ 2     Following a jury trial, defendant, Justin R. Roof, was found guilty of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2016)) and battery (720 ILCS 5/12-3(a)(2) (West 2016)). The trial court sentenced him to 180 days in jail. On appeal, defendant argues (1) he is entitled to a new trial because the trial court erred by failing to properly admonish potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and the evidence at trial was closely balanced, (2) he is entitled to a new trial because defense counsel provided him with ineffective

assistance by failing to present the recorded statement of Amanda Goodwin (Goodwin) as impeachment or substantive evidence, and (3) his conviction for battery and the related fines must be vacated under the one-act, one-crime rule because the State treated defendant's conduct as a single act. We affirm.

¶ 3                                I. BACKGROUND

¶ 4        On October 4, 2016, the State charged defendant with domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2016)) and battery (720 ILCS 5/12-3(a)(2) (West 2016)). The battery charge alleged that on October 2, 2016, defendant "knowingly and without legal justification made physical contact of an insulting or provoking nature with Anna Henson by pushing Anna Henson." The domestic battery charge contained the same allegations but additionally alleged Anna Henson (Henson) was "a family or household member."

¶ 5        The cause proceeded to a jury trial on March 7, 2017. During *voir dire*, the trial court addressed prospective jurors as follows regarding what it described as "some core principles of our criminal justice system."

> "First principle, does anyone have any difficulty with the presumption of innocence that remains with the defendant throughout this trial and even up to your deliberations and up to and during your deliberations on the verdict? Show no hands in the jury box or the gallery. The State has the burden of proof in this matter. That proof is beyond a reasonable doubt. Does anybody have any problem with the burden of proof and the fact that the State has to maintain that burden? The defendant is not required to prove his innocence. Anyone have any issues with that? And should the defendant choose not to testify, it cannot be held against him. Show

no hands in the gallery or the jury box on any of the four principles." Defendant did not object to the manner in which the court addressed these principles.

¶ 6            During its opening statement, the State informed jurors they would hear about two actions by defendant, one of which was observed by a single witness and the other of which was observed by police officers.

¶ 7            After its opening statement, the State called Goodwin. According to Goodwin, at approximately 8:00 p.m. on October 2, 2016, she was driving her car toward the intersection of Morris Avenue and Wood Street in Bloomington. As she approached the intersection, she noticed a group of four people, two men and two women, on the sidewalk. According to Goodwin, each member of the group appeared intoxicated and they were "arguing, screaming, [and] yelling." Before Goodwin reached the intersection herself, she stopped her car and watched the group. She then saw "a gentleman push a lady with a lot of force to the point where it made her kind of fly across the yard." Goodwin explained, when the man pushed the woman, his arms were "fully extended" and the woman "flew across *** a good little piece of yard." Goodwin saw the woman stand up and noticed she was "really upset and crying." Goodwin testified the man who pushed the woman wore "[a] wife beater, jeans, *** [and] a bandana" and had "a lot of tattoos." Goodwin also testified the woman had "a dark T-shirt on with jeans." Although Goodwin testified she was between 30 and 40 feet away from the group when the woman was pushed, she testified her view of the incident was "absolutely not" obstructed. Goodwin made an in-court identification of defendant as the man she saw push the woman.

¶ 8            Goodwin testified that, after she saw defendant push the woman, she got out of her car and shouted that she was calling the police. According to Goodwin, defendant then began to

approach her but eventually walked away. At that point, Goodwin called 9-1-1 and remained where she was on the street until police arrived a short time later. Goodwin gave police a description of "the four people," the "gentleman that pushed the lady," "the lady," and "the [direction] that they were walking in." Goodwin also provided police with a description of "what they looked like [and] what [she] saw on them," such as whether they had tattoos. Goodwin testified she "gave [police] as much information as [she] could."

¶ 9        On cross-examination, defense counsel asked Goodwin whether it was dark outside when she observed the woman being pushed. Goodwin responded "it wasn't that dark out" and "[i]t wasn't daylight, but it wasn't dark dark." When defense counsel asked Goodwin whether she was able to observe the push from where her car was parked, she responded "I [saw] it perfectly clear." Goodwin also testified on cross-examination that she stopped her car "before [she] got to the stop sign" and "in the middle of the road." According to Goodwin, her vehicle was the only one in that area and there was no one else present except her and the four people in the group. Goodwin also testified on cross-examination that, after she yelled, the two members of the group not involved in the push crossed the street and walked around a corner. She further testified, after defendant stopped approaching Goodwin, he walked away and was followed by the woman he pushed. Goodwin also testified that she did not see any kind of physical marks on the woman who had been pushed, although the woman was crying.

¶ 10        After Goodwin spoke with police at the intersection of Morris Avenue and Wood Street, she gave an audio-recorded interview with police at her home later in the evening. During the interview, Goodwin explained that just before the intersection of Morris Avenue and Wood Street, she "saw a gentleman fighting with another gentleman and another lady. H[e] pushed the

- 4 -

lady across onto the ground and was trying to get other people that were stopping at the stop sign to fight them and get them out of their cars." The officer asked Goodwin how the man had pushed the woman, inquiring whether the push was "open handed with *** both his hands to her chest." Goodwin responded she "d[id]n't know exactly how he [the man] did it [pushed the woman]. [She] just saw him right by her and her flying across the yard." Goodwin observed this from "a car length away" and stated nothing obstructed her view. She described the male who pushed the woman as "[a] white male" with a "shaved" haircut and tattoos. She also stated the male who pushed the woman was wearing a white "[wife] beater," blue jeans, and a bandana on his head. Goodwin described the woman who had been pushed as a "white female" with "darker hair" who had "a blue t-shirt on and blue jeans on." She also stated that when the woman got up after being pushed, she was "crying and there were words." Finally, Goodwin stated that once the woman who was pushed got up, the woman "walked off with a gentleman with a black shirt and shorts on, dark shorts on. And then the gentleman that had pushed her and the lady that was following him had went a separate way." The woman who had not been pushed wore "a black like tank-top-type shirt *** and like dark jeans." This interview was not admitted into evidence, used to impeach Goodwin, or otherwise considered by the jury.

¶ 11　　　　The State next called Officer Jacob Law of the Bloomington Police Department. Officer Law testified that on October 2, 2016, he met with Goodwin in response to her 9-1-1 call. Goodwin provided Officer Law a description of the man and woman involved in the altercation and the direction she observed them leave. After interviewing Goodwin, Officer Law learned another officer had located a man and woman supposedly matching Goodwin's descriptions on Morris and Elm Street, a block north of the location where Officer Law had met Goodwin. Officer

Law drove to that location. According to Officer Law, once he arrived, he observed that the woman matched the description given by Goodwin, but the man did not. Officer Law questioned the woman who was later identified as Henson. According to Officer Law, Henson denied being involved in any kind of altercation that evening. As Officer Law left the couple and returned to his vehicle, he observed defendant approaching Henson. According to Officer Law, defendant appeared to be intoxicated and was wearing a white tank top, a bandana and blue jeans. Officer Law further testified that upon inquiry, defendant denied being involved in an altercation earlier that day. While Officer Law spoke with defendant, additional officers arrived. Officer Law then informed defendant that he and Henson were free to go, at which point defendant became "agitated" and began using expletives and calling officers derogatory names. Eventually, the couple began to walk away but "[defendant] kept trying to come back" and using expletives while "[t]he female was telling him just to leave, to walk away" and "trying to hold him back or make him go the opposite direction from [us]." Officer Law testified his attention was then diverted, but a short period of time later he heard the other officers yelling at defendant that he was under arrest. Officer Law did not observe the conduct resulting in defendant's arrest.

¶ 12        On cross examination, Officer Law testified Henson was wearing "a blue shirt and blue shorts, maybe jean shorts," and, by her own admission, had been drinking. He also testified that Henson was not crying at that time, did not appear fearful or angry, but obviously "wanted to leave pretty quickly." Officer Law testified he never obtained an identification from Goodwin that Henson and defendant were the couple involved in the altercation she had witnessed.

¶ 13        The State next called Officer James Clesson of the Bloomington Police Department. Officer Clesson testified he responded to the same call as Officer Law and arrived at

the intersection of Elm Street and Morris Avenue just before Officer Law told defendant and Henson they were free to leave. Officer Clesson testified he immediately noticed defendant appeared agitated and intoxicated and he overheard defendant repeatedly tell Henson to "shut the 'F' up." According to Officer Clesson, despite Henson's attempts to make defendant walk away, he "would re[-]approach officers, yell[ing] profanities at [them]." Officer Clesson testified that Henson tried to "hug" defendant to attempt to direct him away from police. According to Officer Clesson, defendant then told Henson to move out of his way, and, eventually, he "took his left and right hand and pushed her away or in a different direction." Officer Clesson further described the push as a "full extension of [defendant's] arms." According to Officer Clesson, after being pushed, Henson "almost stumbled backward or she took a step backward to regain her balance," but she did not fall over. Officer Clesson testified he had a "clear view" of defendant push Henson. At this point, Officer Clesson and another officer arrested defendant.

¶ 14    After the arrest, Officer Clesson conducted an interview of defendant. During the interview, defendant admitted he and Henson had been dating for two weeks and she was pregnant with his child. Defendant further admitted he and Henson were in a verbal argument after the police told them they were free to leave, and he stated, "I'm not doing this and I pushed [Henson] out of my way. *** If you got *** what you need, I pushed her out of my way so she would stop f*** grabbing me."

¶ 15    On cross-examination, Officer Clesson testified that when he first arrived at the scene that evening, he observed that Henson seemed "upset" and that both she and defendant appeared intoxicated. Officer Clesson also testified that in the incident report he prepared after defendant was arrested, he noted Henson was "angry and irrational," but he could not recall

whether she was crying. Officer Clesson testified that after Henson hugged defendant, defendant freed himself, and the two "were kind of interlocked or together in close proximity." Officer Clesson testified, after defendant freed himself from Henson's hug, he "couldn't tell necessarily if they had separated and came back or just kind of a comingling of the two as she was trying to get him to walk in the opposite direction of the police officers." However, Officer Clesson testified he clearly saw the "aftermath" of the push, stating he saw "[defendant] pushing [Henson], his arms extending, and then her coming back as he moved forward."

¶ 16　　　The State's final witness was Officer Squires of the Bloomington Police Department. Officer Squires testified he arrived at the intersection of Elm Street and Morris Avenue just before defendant and Henson were told they could leave. Officer Squires's testimony was consistent with that of Officer Law and Clesson. However, he described the push as follows: "[Defendant] reached out, he grabbed [Henson] underneath the arms, picked her up off the ground, turned her around and proceeded to shove her backwards." Defendant's push caused Henson to take several steps back, but she did not fall over. Officer Squires testified that when defendant pushed Henson, his arms were "fully extended." After defendant was arrested, Officer Squires interviewed Henson who admitted she was pregnant with defendant's child.

¶ 17　　　After Officer Squires testified, the State rested and defendant moved for a directed finding which was denied. Defendant presented no evidence.

¶ 18　　　During its closing argument, the State argued defendant pushed Henson twice, as evidenced by the testimony of Goodwin and the officers.

¶ 19　　　Defendant was found guilty of both domestic battery and battery. The trial court sentenced defendant to 180 days' incarceration and imposed certain fines and fees, including $12

in court costs and a $45 statutory surcharge (730 ILCS 5/5-9-1(c) (West 2016)), both of which were assessed for defendant's battery conviction.

¶ 20        This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22        On appeal, defendant argues (1) he is entitled to a new trial because the trial court erred by failing to properly admonish potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and the evidence at trial was closely balanced, (2) he is entitled to a new trial because defense counsel provided him with ineffective assistance by failing to present the recorded statement of Goodwin as impeachment or substantive evidence, and (3) his conviction for battery and the related fines must be vacated under the one-act, one-crime rule because the State treated defendant's conduct as a single act.

¶ 23                        A. *Voir Dire* Admonishments

¶ 24        Defendant first argues he is entitled to a new trial because the trial court erred by failing to properly admonish potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Defendant acknowledges he has forfeited this issue for review by failing to raise it during trial and in a posttrial motion. See *People v. Belknap*, 2014 IL 117094, ¶ 66, 23 N.E.3d 325 ("To preserve an alleged error for review, a defendant must both make an objection at trial and include the issue in a posttrial motion."). However, he argues the issue should be addressed pursuant to the plain-error doctrine.

¶ 25        "To obtain relief under [the plain-error doctrine], a defendant must first show that a clear or obvious error occurred." *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010). After showing the existence of clear or obvious error, a defendant must then show either:

(1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007).

¶ 26        Defendant concedes "[a] Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury" (*People v. Sebby*, 2017 IL 119445, ¶ 52, 89 N.E.3d 675) and he makes no argument that the second prong of plain-error applies here. Therefore, if we determine that a clear or obvious error occurred, we must also determine whether the evidence in defendant's case was closely balanced, as required under the first prong of the plain error doctrine. "We review *de novo* whether the trial court followed Rule 431(b)." *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 22, 115 N.E.3d 1207.

¶ 27        Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires the trial court to ask all potential jurors whether they both "understand" and "accept" that (1) the defendant is presumed innocent, (2) the State bears the burden of proving the defendant guilty beyond a reasonable doubt, (3) the defendant has no obligation to present evidence, and (4) the defendant's choice to not testify cannot be held against him. These principles are commonly referred to as the four *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984)). Rule 431(b) "mandates a specific question and response process," requiring the trial court to "ask each potential juror whether he or she understands and accepts each of the principles in the rule." *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409-10 (2010). "Trial courts must exercise diligence when instructing the jury of the *Zehr* principles as codified in Rule 431(b) and must not deviate in any way from

the precise language chosen by the Illinois Supreme Court to be in that rule." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 35, 92 N.E.3d 494. Our supreme court has previously found clear error where a trial court only inquired whether jurors " 'had any problems with' or 'believed in' " the *Zehr* principles. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 28　　　　Here, the trial court asked potential jurors whether they had any "issues with," "difficulty with," or "problem with," the *Zehr* principles. The court did not ask whether the jurors "underst[oo]d" and "accept[ed]" the principles. The court's admonishments did not comply with Rule 431(b) and, therefore, constituted clear error. See *id.*

¶ 29　　　　Having concluded the trial court's admonishments were improper, we now consider whether the evidence was closely balanced. "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Id.* ¶ 51. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. Our review requires "an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* Considering whether evidence is closely balanced "does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence." *Id.* ¶ 60.

¶ 30　　　　Evidence may be closely balanced even where the defendant presents no evidence at trial. See *Piatkowski*, 225 Ill. 2d at 567 ("Although defendant has the burden before this court to show that the evidence is closely balanced, he had no burden to present any evidence or to testify himself at trial."). For example, "evidence can be closely balanced where the evidence comes from

unreliable witnesses who offer conflicting accounts or from prosecution witnesses who provide evidence favorable to [the defendant]." *People v. Othman*, 2019 IL App (1st) 150823, ¶ 68. However, evidence is not closely balanced where jurors are merely asked to assess testimony that is not "called into question by a competing witness, cross-examination or other evidence." *People v. Hammonds*, 409 Ill. App. 3d 838, 862, 957 N.E.2d 386, 407 (2011).

¶ 31        Defendant first contends the evidence was closely balanced that he was the man Goodwin saw push a woman and that Henson was the woman who Goodwin saw pushed. In support of his contention, defendant first argues "[w]hen considering that Goodwin saw the altercation from a considerable distance at dusk, her brief view of [defendant] confirms only that [defendant] was among the four intoxicated people at the corner of Morris and Wood; and that Goodwin's description of the clothing [defendant] wore was accurate." Defendant next argues Goodwin's description of Henson conflicted with Officer Law's description. Finally, defendant argues, contrary to Goodwin's testimony that the woman who was pushed followed the man who pushed her, Officer Law testified when he first found Henson, she was not with defendant, but was with the other man from the original group of four observed by Goodwin.

¶ 32        Based on our review of the record, Goodwin clearly identified defendant as the man she saw push Henson. During her direct examination, Goodwin testified that although she was 30-40 feet away from the group when the event occurred, she was certain her view of the push was unobstructed. She also identified defendant in court as the person she saw push Henson. Defense counsel failed to cast doubt on Goodwin's testimony or her credibility on cross examination. In response to defense counsel's questions, Goodwin testified she saw defendant push Henson "perfectly" and that, after she yelled at defendant, he began to approach her, thus reducing the

- 12 -

distance between defendant and Goodwin and, undoubtedly, improving Goodwin's ability to describe him to police and to identify him later.

¶ 33 Defendant next argues that inconsistencies between Goodwin's testimony and the testimony of Officer Law renders the evidence closely balanced. According to defendant, Goodwin's description that the woman who was pushed was wearing "a dark T-shirt *** with jeans" is contradictory to Officer Law's description that Henson wore a "blue shirt and blue shorts." As an initial matter, we note Officer Law actually testified Henson wore "a blue shirt and blue shorts, *maybe jean shorts*." Regardless, we fail to see any meaningful contradiction between Officer Law's description that Henson wore jean shorts and Goodwin's description that Henson wore jeans. Defendant also argues the officers' testimony that they did not observe Henson to be crying contradicts Goodwin's testimony that Henson was crying after defendant pushed her. This aspect of the trial testimony alone is insufficient to cast doubt that Henson was the woman Goodwin saw pushed. It is not clear how much time passed from when Goodwin observed that Henson was crying and the time when Officer Law located Henson. Moreover, even if Henson were not crying when Officer Law observed her, defendant's proximity to Henson after Officer Law arrived and the fact that Henson's clothing matched Goodwin's description of the woman who had been pushed substantially outweigh any doubt that Henson was not the woman who was pushed.

¶ 34 Finally, that defendant was not with Henson when Officer Law first made contact with her does not make the evidence closely balanced. Goodwin stated the man who pushed the woman appeared intoxicated, wore "[a] wife beater, jeans, *** [and] a bandana," and had "a lot of tattoos." Officer Law testified, when he saw defendant a short time later, he appeared intoxicated

and wore "a white tank top, a bandana and blue jeans." Goodwin provided an in-court identification of defendant as the man who pushed the woman. In light of Goodwin's clear description of defendant as Henson's assailant, whether Henson followed defendant or the other male and what might have occurred between the time Goodwin last saw defendant and the time Officer Law arrived is irrelevant.

¶ 35　　　　Defendant next contends the evidence is closely balanced that when defendant pushed Henson the second time, he did so in an "insulting or provoking nature." Defendant argues the evidence regarding this element was closely balanced because "it is *** plausible that [defendant] made contact with Henson that was not insulting or provoking, but inevitable under the circumstances" because Henson was blocking his attempt to approach the police officers.

¶ 36　　　　The victim of a battery need not testify explicitly that the contact was of an insulting or provoking nature. *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55, 959 N.E.2d 693. Our court has previously found, "a particular physical contact may be deemed insulting or provoking based upon the factual context in which it occurs." (Internal quotation marks omitted.) *People v. Peck*, 260 Ill. App. 3d 812, 814, 633 N.E.2d 222, 223 (1994).

¶ 37　　　　Officer Clesson testified that shortly after he first observed defendant, defendant repeatedly told Henson to "shut the 'F' up." All three officers testified that before defendant pushed Henson, she was pleading with defendant to walk away and attempting to restrain him from approaching the police and further cursing and insulting them. We find defendant's act of pushing Henson out of his way was of an insulting or provoking nature. Although only Officer Clesson testified that he heard defendant use expletives toward Henson before he pushed her, his testimony was not contradicted by Officers Law or Squires, both of whom agreed defendant was intoxicated

and was using foul language. The officers' testimony was not inconsistent or called into question on cross-examination, and was not contradicted by other evidence. Therefore, the evidence that defendant pushed Henson in an insulting or provoking manner is not closely balanced. See *Hammonds*, 409 Ill. App. 3d at 861-62.

¶ 38       Evaluating the totality of the evidence and conducting a qualitative, commonsense assessment, we conclude that the evidence was not closely balanced. See *Sebby*, 2017 IL 119445, ¶ 53. The testimony of Goodwin and the police officers establishing defendant's guilt was consistent and uncontradicted. Accordingly, we find the evidence was not so closely balanced as to warrant reversal under the plain error doctrine.

¶ 39                    B. Ineffective Assistance of Counsel

¶ 40       Defendant's second contention on appeal is that he is entitled to a new trial because defense counsel provided him with ineffective assistance by failing to offer the recorded statement of Goodwin as impeachment or substantive evidence. According to defendant, "Goodwin's statement was inconsistent with or completely contradicted critical parts of her trial testimony. Yet, defense counsel did not introduce Goodwin's statement into evidence." Defendant asserts, and the State concedes, portions of Goodwin's recorded statement would have been admissible evidence as a prior inconsistent statement. See 725 ILCS 5/115-10.1 (West 2016).

¶ 41       "A claim of ineffective assistance of counsel is evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *People v. Henderson*, 2013 IL 114040, ¶ 11, 989 N.E.2d 192. To prevail on a claim of ineffective assistance of counsel, "a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy either of the prongs precludes a finding of ineffective assistance of counsel. *Id.* "When a claim of ineffective assistance of counsel was not raised at the trial court, our review is *de novo.*" *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88, 129 N.E.3d 755.

¶ 42    "Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel." *People v. West*, 187 Ill. 2d 418, 432, 719 N.E.2d 664, 673 (1999). Further, "[t]he manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *People v. Pecoraro*, 175 Ill. 2d 294, 326-27, 677 N.E.2d 875, 891 (1997). "[M]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent. The only exception to this rule is when counsel's chosen trial strategy is so unsound that counsel entirely fails to conduct any meaningful adversarial testing." (Internal quotation marks omitted.) *West*, 187 Ill. 2d at 432-33.

¶ 43    Although "the complete failure to impeach the sole eyewitness when significant impeachment is available is not trial strategy and, thus, may support an ineffective assistance claim" (*People v. Salgado*, 263 Ill. App. 3d 238, 246-47, 635 N.E.2d 1367, 1373 (1994)), counsel is not ineffective for failing to impeach a witness based on prior statements with minor variances and inconsistences with regard to collateral matters (See *People v. Jimerson*, 127 Ill. 2d 12, 35-37, 535 N.E.2d 889, 899-900 (1989) (declining to find counsel ineffective after failing to impeach the State's witnesses with inconsistent statements where the value of their inconsistent testimony was nominal)). Further, when assessing whether trial counsel was ineffective for failing to impeach a witness, "[t]he value of the potentially impeaching material must be placed in perspective." *Id.* at

33.

¶ 44　　　　In the present case, defendant argues Goodwin's audio-recorded interview contradicted her trial testimony in three ways. According to defendant, Goodwin's recorded statement contradicts her trial testimony that she saw defendant push Henson with arms "fully extended," that there were no other cars present during the incident and that her view was unobstructed, and that the woman who was pushed followed defendant afterward.

¶ 45　　　　We find that admission of those portions of Goodwin's recorded statement identified by defendant likely would not have affected the jury's determination of guilty. Although, during her interview with Officer Clesson, Goodwin stated she "d[id]n't know exactly how [defendant] did it [pushed the woman]" and she "just saw him right by her and her flying across the yard," these statements were in response to Officer Clesson's question whether defendant pushed Henson with both arms fully extended. The *manner* in which defendant pushed Henson is irrelevant to a determination of *whether* defendant pushed her. In other portions of Henson's interview, she stated defendant "pushed the lady across onto the ground" and provided a description of the man who pushed Henson that exactly matched the description she provided in court. Similarly, the inconsistency between Goodwin's recorded statement and her testimony regarding the presence of other cars does not cast doubt on her assertion that she clearly observed defendant push Henson. Shortly after Goodwin stated in her interview that defendant was yelling at drivers of other cars, she stated she observed him push Henson from only a car length away and nothing obstructed her view. Finally, the inconsistency between Goodwin's statements regarding who Henson followed after defendant pushed her is irrelevant in light of Goodwin's clear description of defendant as Henson's assailant.

¶ 46 The inconsistencies between Goodwin's testimony and her recorded statement are not "significant." *Salgado*, 263 Ill. App. 3d at 247. Any inconsistencies are clarified by other statements contained in the interview or have no impeachment or evidentiary value to the issue of whether defendant pushed Henson. Therefore, we find defense counsel's performance did not fall below an objective standard of reasonableness and, consequently, counsel did not render ineffective assistance.

¶ 47 C. One-Act, One-Crime Doctrine

¶ 48 Defendant's final contention on appeal is that his conviction for battery must be vacated under the one-act, one-crime doctrine because the State treated defendant's conduct as a single act. Specifically, defendant argues his conviction for battery violated the one-act, one-crime doctrine because "neither the information nor the prosecutor at trial specified which charge applied to which act." Defendant acknowledges he failed to raise this issue with the trial court but maintains we may review his claim under the plain-error doctrine. "[A]n alleged one-act, one-crime violation and the potential for a surplus conviction and sentence affects the integrity of the judicial process, thus satisfying the second prong of the plain error rule." *People v. Harvey*, 211 Ill. 2d 368, 389, 813 N.E.2d 181, 194 (2004).

¶ 49 The one-act, one-crime doctrine "concerns the number of convictions obtainable based on a single act or a series of closely related acts." *People v. Hunter*, 2013 IL 114100, ¶ 21, 986 N.E.2d 1185. The seminal case regarding the one-act, one-crime doctrine is *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977). There, our supreme court explained:

"[(1)] Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. [(2)] Prejudice, with regard

to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. [(3)] Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *Id.* at 566.

Our court has previously construed this rule as follows:

"If [a] case involves only a single physical act under rule (1), or multiple acts and lesser included offenses under rule (2), then defendant cannot be convicted of both [charged crimes], even if the sentences for the two convictions would run concurrently. The distinction between rule (2) and rule (3) is between offenses closely related to each other (only one conviction permitted) and offenses not closely related (multiple convictions possible)." *People v. Yeast*, 236 Ill. App. 3d 84, 88-89, 601 N.E.2d 1367, 1370 (1992).

Thus, we must first determine whether the evidence suggests defendant committed a single act or multiple acts. If defendant committed multiple acts, we must then determine whether the acts were closely related to each other. "We review *de novo* the issue of whether there was a violation of the one-act, one-crime rule." *People v. Stull*, 2014 IL App (4th) 120704, ¶ 43, 5 N.E.3d 328.

¶ 50    The State presented evidence that defendant pushed Henson on two separate

occasions and clearly argued the two pushes were distinct from each other. Goodwin testified she observed defendant push Henson at the intersection of Morris Avenue and Wood Street. Officers Clesson and Squires testified they observed defendant push Henson a while later near the corner of Morris Avenue and Elm Street. Officer Clesson testified defendant pushed Henson after telling her to "shut the 'F' up." Defendant admitted he pushed Henson and admitted Henson was his girlfriend. During opening statement and closing argument, the State asserted several times that defendant committed two acts, arguing, for example, "[domestic] violence can take its form in many different ways. And, today, in this case it was the defendant pushing the victim to the ground on the first instance, and then on [*sic*] the second time in front of the police pushing her" and "[t]wo different pushes, all fully extended, all violent pushes." Both pushes constitute battery and domestic battery (See 720 ILCS 5/12-3.2(a)(2) (West 2016); 720 ILCS 5/12-3(a)(2) (West 2016)), and both constitute "overt or outward manifestation[s]" that individually "support[ed] a different offense." *King*, 66 Ill. 2d at 566. Thus, the evidence demonstrates defendant committed multiple acts for purposes of the one-act, one-crime doctrine.

¶ 51　　　　We further find that defendant's two acts were not closely related. We find *People v. Alvarado*, 235 Ill. App. 3d 116, 600 N.E.2d 1236 (1992), instructive. In *Alvarado*, the defendant argued his convictions for criminal sexual assault and unlawful restraint should be vacated under the one-act, one-crime doctrine. *Id.* at 116-17. In that case, the defendant drove the victim to a deserted area, grabbed her around the neck, and choked her. *Id.* at 117. The defendant released the victim from his grasp and then drove her to another secluded area where he sexually assaulted her. *Id.* The defendant then drove the victim to the home of one of his relatives where she jumped out of the car and attempted to enter the residence until defendant physically prevented her from

escaping. *Id.* The court affirmed the defendant's two convictions, finding "the convictions were based upon separate, independent acts which were not closely related. *** [T]he defendant's initial choking of the victim was [not] in any way related to his later rape of her. In addition, his final restraint *** was not related to the sexual assault." *Id.*

¶ 52       Here, as in *Alvarado*, defendant's actions were not closely related to each other. Defendant's two acts of pushing Henson occurred a block away from each other and a period of time apart. Further, the circumstances relating to the two separate altercations were substantially different from each other.

¶ 53       Defendant cites *People v. Crespo*, 203 Ill. 2d 335, 788 N.E.2d 1117 (2003), in support of his contention that his convictions for domestic battery and battery violated the one-act, one-crime doctrine. He maintains that, pursuant to *Crespo*, it is improper to permit the State to obtain multiple convictions against him when the State's clear intent—as evidenced by its charging instrument—was to portray defendant's conduct as a single physical act.

¶ 54       In *Crespo*, the defendant was convicted and sentenced for armed violence and aggravated battery, all in connection with the stabbing of a single victim. *Id.* at 337. Evidence at the defendant's trial showed he stabbed the victim "three times in rapid succession, once in the right arm, and twice in the left thigh." *Id.* at 338. On appeal to the supreme court, the defendant argued his aggravated battery conviction had to be vacated since the same physical act formed the basis for both the aggravated battery conviction and the armed violence conviction. *Id.* at 340. According to the defendant, the three stab wounds to the victim were not "different offenses" such that multiple convictions could be sustained. *Id.* The State responded asserting that each of the three stab wounds to the victim constituted separate offenses, each capable of independently

sustaining a criminal conviction. *Id.* After reviewing the indictment and the State's theory of the case at the defendant's trial, the court found that the defendant's aggravated battery conviction could not stand. Specifically, the court noted "the counts charging defendant with armed violence and aggravated battery d[id] not differentiate between the separate stab wounds. Rather, these counts charge[d] defendant with the same conduct under different theories of criminal culpability." *Id.* at 342. The court continued, "[n]owhere in these charges d[id] the State attempt to apportion these offenses among the various stab wounds." *Id.* at 343. Additionally, the court looked to the State's closing argument, finding "the State's theory at trial, as shown by its argument to the jury, amply support[ed] the conclusion that the intent of the prosecution was to portray [the] defendant's conduct as a single attack." *Id.* at 343-44. The court stressed that "the State *could have*, under our case law, charged the crime [as separate offenses], and *could have* argued the case to the jury that way[, but it] chose not to do so." (Emphases in original.) *Id.* at 344. According to the court, "to apportion the crimes among the various stab wounds for the first time on appeal would be profoundly unfair." *Id.* at 343. Finally, the court concluded, "[t]oday's decision merely holds that in cases such as the one at bar, the indictment must indicate that the State intended to treat the conduct of defendant as multiple acts in order for multiple convictions to be sustained." *Id.* at 345.

¶ 55        Defendant's reliance on *Crespo* is misplaced. As the *Crespo* court noted, its holding that the State must indicate in the indictment whether it intends to treat defendant's acts as a single act or as multiple acts only applies to "cases such as the one at bar." *Id.* In other words, *Crespo* holds that "a charging instrument must indicate that the State intends to treat the conduct of the defendant—*where it is comprised of several distinct yet very closely related acts*—as multiple acts in order for multiple convictions to be sustained." (Emphasis added.) *People v. Woodard*, 367 Ill.

App. 3d 304, 318, 854 N.E.2d 674, 689 (2006); see *People v. Bishop*, 218 Ill. 2d 232, 245, 843 N.E.2d 365, 373 (2006) ("The concern in *Crespo* was the State's treatment of three closely related acts as one act in the indictment and at trial[.]"). Here, the State presented evidence of and argued the existence of two obviously unrelated acts: two altercations that occurred a block away from each other, a period of time apart, and under very different circumstances. Because the existence of separate acts was presented and argued, it is clear the State did not intend to present the charges of domestic battery and battery as alternative theories of liability for a single act, as in *Crespo*. *Crespo*, 203 Ill. 2d at 342. In this case defendant's two acts were not closely related and, therefore, *Crespo* is inapplicable.

¶ 56        The State presented evidence of two separate incidents in which defendant pushed Henson. The two pushing incidents were not closely related. Therefore, because defendant's convictions for domestic battery and battery did not violate the one-act, one-crime rule, we find no plain error occurred.

¶ 57                                      III. CONCLUSION

¶ 58        For the reasons stated, we affirm the trial court's judgment.

¶ 59        Affirmed.