Docket No. 86556–Agenda 9–November 1999.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HECTOR CRESPO, Appellant.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Hector Crespo, was convicted of the first degree murder of Maria Garcia in a jury trial in the circuit court of Cook County. The jury also convicted him of one count of armed violence, one count of aggravated battery based on intentionally or knowingly causing great bodily harm, and one count of aggravated battery using a deadly weapon, all in connection with the stabbing of Garcia’s daughter, Arlene. The circuit court sentenced defendant to a 75-year term of imprisonment for the murder and to a 30-year term for armed violence. The court also imposed a five-year term for aggravated battery after stating that the two aggravated batteries were merged. All of the prison terms were to be served concurrently.

Defendant appealed his convictions. He maintained that his conviction for aggravated battery could not stand because it was based on the same single act as the armed violence charge. He also argued that the trial court erred in refusing to give the jury an instruction on second degree murder. The appellate court affirmed defendant’s convictions and ordered the circuit clerk to amend the mittimus to reflect that defendant was convicted of first degree murder, armed violence, and one count of aggravated battery. No. 1–97–3057 (unpublished order under Supreme Court Rule 23). Defendant filed a petition for leave to appeal, arguing only that his conviction for aggravated battery should be vacated because it stemmed from the same physical act as the armed violence charge. We allowed defendant’s petition (177 Ill. 2d R. 315(a)) and now reverse, in part, the judgment of the appellate court.

Background

The facts giving rise to defendant’s convictions are not in dispute. Defendant and the murder victim, Maria Garcia, lived together with their infant son and Garcia’s daughters. On June 25, 1995, defendant, after consuming alcohol and cocaine throughout the day, returned home at around 9:15 p.m. According to Garcia’s daughter, Arlene, shortly after defendant’s arrival home, he and her mother began to argue over money and the fact that defendant was wearing a gold necklace that belonged to Garcia. As the argument intensified, Garcia asked defendant to leave the house. Defendant refused, and Garcia told Arlene to call the police. Arlene called 911 and told the dispatcher that she wanted her stepfather escorted from the home because he was getting violent. After the 911 call was made, defendant locked himself in a bedroom.

Defendant eventually began to leave the house through a back door. At that time, Garcia told him “don’t leave you coward.” Garcia told defendant that she wanted police to “escort him out.” Defendant replied that he was not afraid of police and that he was not “a coward.” The two then argued more, and moved into the kitchen near some drawers. Defendant attempted to reach into a drawer where knives were kept, but Garcia closed it. A few minutes later, defendant pulled out a knife about eight inches long. Garcia again tried to shut the drawer, but defendant hit her in the head with his fist. The two began to fight. When Arlene tried to intercede, defendant stabbed her three times in rapid succession., once in the right arm, and twice in the left thigh. After defendant stabbed Arlene, defendant turned to Garcia and grabbed her by the hair. He then stabbed her. As defendant stabbed Garcia, Arlene ran out of the house, calling for help.

According to neighbors, Arlene ran from her house screaming for help. Police officers responded to the scene and found Arlene hysterical. She told them that her stepfather had stabbed her and that her mother and younger brother were still in the house. Police found Garcia lying on the kitchen floor in a pool of blood. Witnesses told police that defendant had fled the scene.

Garcia died as a result of the injuries inflicted by defendant. The autopsy revealed that she had sustained multiple stab wounds to the neck, chest, and abdomen. Arlene was treated for her wounds at the hospital, where approximately 20 staples were needed to close the three stab wounds.

Police arrested defendant in July 1995, and a grand jury returned an indictment against him several weeks later. Specifically, the indictment charged defendant with two counts of first degree murder, one count of attempted first degree murder, two counts of aggravated battery (one count based on battery with a deadly weapon, and one count based on great bodily harm), and one count of armed violence. The armed violence charge was predicated upon the great bodily harm aggravated battery charge. Defendant was also indicted on one count of theft, which the State later agreed to nol-pros. The jury returned verdicts finding defendant (i) guilty of first degree murder, (ii) guilty of armed violence, (iii) guilty of aggravated battery based on great bodily harm, (iv) guilty of aggravated battery based on a deadly weapon, and (v) not guilty of attempted murder.

As noted previously, defendant maintained in the appellate court that his aggravated battery conviction must be vacated because it was based on the same physical act as his armed violence conviction, or, alternatively, that the mittimus, which reflected two aggravated battery convictions, should be corrected to reflect the fact that the trial court merged defendant’s two aggravated battery convictions into one aggravated battery conviction. The appellate court rejected defendant’s “same physical act” argument, but amended the mittimus to reflect one, as opposed to two, aggravated battery convictions.
(footnote: 1)

Discussion

Defendant maintains that the remaining aggravated battery conviction must be vacated because the aggravated battery charge stemmed from the same physical act which formed the basis of the armed violence charge. According to defendant, the three stab wounds to Arlene did not constitute “different offenses” such that multiple convictions can be sustained.

The State responds that the appellate court, in rejecting defendant’s contention, properly applied the precedent of this court. The State maintains that defendant stabbed Arlene three times and that each act of stabbing properly constitutes a separate offense. As framed by the State, the issue before this court is whether these three different stabbings were three “separate and distinct acts” each capable of independently sustaining a complete criminal conviction.

The seminal case in this area is 
People v. King
, 66 Ill. 2d 551 (1977). There, this court explained:

“Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. ‘Act,’ when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered.” 
King
, 66 Ill. 2d at 566.

Based on this reasoning, the court in 
King
 upheld the defendant’s convictions for rape and burglary because the offenses were based on separate acts, each requiring proof of a different element.

Both defendant and the State ask this court to revisit 
King
, albeit for different reasons. Defendant urges us to reconsider the definition of an “act” in 
King
 and specifically asks us to consider a six-part test that has developed in the appellate court. The State, on the other hand, argues that the “multiple acts/lesser included offense” portion of the 
King
 rule has caused confusion over the years and asks us to clarify it.

The State correctly notes that, in 
King
, this court defined an “act” as any overt or outward manifestation that will support a separate offense. 
King
, 66 Ill. 2d at 566. This court has consistently used the 
King
 definition of an “act.” For example, in 
People v. Myers
, 85 Ill. 2d 281 (1981), we considered a situation in which the defendant stabbed one victim in the throat, removed the knife briefly to cut a second victim, then again stabbed the first victim in the throat. In determining that the defendant committed two physical acts with respect to the first victim, this court accorded significance to the fact that there was a distinct, intervening act separating the successively inflicted stab wounds. See 
Myers
, 85 Ill. 2d at 288-89. One year later, in 
People v. Dixon
, 91 Ill. 2d 346 (1982), this court again looked to 
King
, interpreting the definition of an “act” narrowly. There, we rejected the argument that striking the victim several times with a club constituted a continuous beating and therefore a single physical act. Rather, we held that the separate blows, although closely related, constituted separate acts which could properly support multiple convictions with concurrent sentences.

As noted, defendant invites this court to apply a six-factor test that has developed in our appellate court in cases that postdate 
Dixon
. See, 
e.g.
, 
People v. Crum
, 183 Ill. App. 3d 473, 490-91 (1989); 
People v. Williams
, 143 Ill. App. 3d 658, 665-66 (1986), 
People v. Horne
, 129 Ill. App. 3d 1066, 1074-75 (1984). The test is a culmination of points gleaned from various Illinois cases. See 
People v. Rodriguez
, 169 Ill. 2d 183, 188 (1996) (discussing test). This court in 
Rodriguez
 acknowledged the existence of the appellate court test, but declined to address its merits. We cautioned, however, that “a court must not lose sight of the forest for the trees. The definition of an ‘act’ under the 
King
 doctrine remains simply what this court stated in 
King
: ‘any overt or outward manifestation which will support a different offense.’ ” 
Rodriguez
, 169 Ill. 2d at 188.

After examining the record in the instant case, we believe that the adoption of the six-factor test is unnecessary to the disposition of this appeal. Under 
Dixon
, each of Arlene’s stab wounds could support a separate offense; however, this is not the theory under which the State charged defendant, nor does it conform to the way the State presented and argued the case to the jury.

A careful review of the indictment in this case reveals that the counts charging defendant with armed violence and aggravated battery do not differentiate between the separate stab wounds. Rather these counts charge defendant with the same conduct under different theories of criminal culpability. The armed violence count of the indictment charged defendant with committing aggravated battery against Arlene while he was armed with a knife that had a blade of over three inches. The aggravated battery counts charged defendant as follows:

“He, intentionally or knowingly without legal justification caused bodily harm to Arlene Guerrero while using a deadly weapon, to wit: A knife by stabbing Arlene Guerrero with said knife, in violation, of Chapter 720, Act 5, Section 12–4–B(1), of the Illinois Compiled Statutes 1992, as amended, and

He, in committing a battery on Arlene Guerrero intentionally or knowingly without legal justification caused great bodily harm to said Arlene Guerrero he stabbed Arlene Guerrero with a knife, in violation, of Chapter 720, Act 5, Section 12–4–A of the Illinois Compiled Statutes, as amended.”

Nowhere in these charges does the State attempt to apportion these offenses among the various stab wounds.

We believe that to apportion the crimes among the various stab wounds for the first time on appeal would be profoundly unfair. When the State originally charged defendant with aggravated battery (great bodily harm), the State alleged that the great bodily harm was stabbing the victim with a knife. The State’s original aggravated battery (deadly weapon) charge was predicated on allegations that defendant stabbed Arlene with a knife. The State’s closing argument, with respect to both charges of aggravated battery, consisted on the following remarks:

“To sustain the charge of aggravated battery, the State must prove the following propositions: first, the defendant knowingly and intentionally caused bodily harm to Arlene Guerrero. We know he stabbed her three times. Second that he used a deadly weapon other than the discharge of [a] firearm. Ladies and gentlemen, this knife is a deadly weapon.”

Then, when the prosecutor addressed armed violence, which was predicated on the offense of aggravated battery (great bodily harm), the assistant State’s Attorney read the elements of the offense and said, “We know that he stabbed Arlene Guerrero three times.” After addressing all of the elements, the prosecutor stated, “each of these propositions has been proved.” Thus, the State’s theory at trial, as shown by its argument to the jury, amply supports the conclusion that the intent of the prosecution was to portray defendant’s conduct as a single attack.

It has been held that what constitutes “great bodily harm” to support a charge of aggravated battery is a question of fact to be determined by the finder of fact. See 
People v. Hadley
, 20 Ill. App. 3d 1072, 1077 (1974). Here, the State specifically argued to the jury that the three stab wounds constituted great bodily harm. The State never argued that only one of the stab wounds would be sufficient to sustain this charge. Again, it must be pointed out that the State 
could have
, under our case law, charged the crime that way, and 
could have
 argued the case to the jury that way. The State chose not to do so, and this court cannot allow the State to change its theory of the case on appeal. It is possible that, although the jury found that all three stab wounds together constituted great bodily harm, the jury would not have considered any one of the stab wounds individually to constitute great bodily harm. This court will not invade the province of the jury and decide this question of fact.

In both 
People v. Crum
, 183 Ill. App. 3d 473, and 
People v. Ellis
, 143 Ill. App. 3d 892 (1986), the appellate court found that the charging instruments evinced the State’s intent to treat the conduct of the defendants as single acts. Similarly, in this case, the charging instruments reveal that the State intended to treat the conduct of the defendant as a single act. In order to convict defendant, the State charged him with stabbing in four different ways, based on four different theories. Apart from the attempted murder charge, the State charged that defendant (i) committed aggravated battery because he caused the victim great bodily harm, (ii) committed aggravated battery because he used a deadly weapon, and (iii) committed armed violence because he committed an aggravated battery while armed with a dangerous weapon. The State made no attempt, however, to apportion these crimes among the stab wounds, and it is improper for this court to do so now on appeal.

Moreover, we believe that today’s decision avoids several constitutional problems that might arise were we to agree with the State that multiple convictions are proper under these circumstances. We note that the United States and Illinois Constitutions both require that a defendant in a criminal prosecution be informed of the nature and cause of the accusation. U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8. Under Illinois law, a defendant has a fundamental right to be informed of the nature and cause of the criminal accusations against him so that he may prepare a defense and so that the charged offense may serve as a bar to subsequent prosecution arising out of the same conduct. 
People v. Meyers
, 158 Ill. 2d 46, 51 (1994). If we were to agree with the State, defendant would not have known until the cause was on appeal that the State considered each of the separate stabs to be separate offenses, and therefore he would not have been able to defend the case accordingly.

We emphasize that in 
Dixon
, this court held that each separate blow of a mop handle could support a separate conviction and that this remains a valid proposition of law. Today’s decision merely holds that in cases such as the one at bar, the indictment must indicate that the State intended to treat the conduct of defendant as multiple acts in order for multiple convictions to be sustained.

Due to our disposition of this appeal, we do not reach the State’s argument regarding lesser-included offenses.

Conclusion

As noted, the appellate court ordered the circuit court to amend the mittimus in this matter to reflect one, not two, aggravated battery convictions and also affirmed the defendant’s convictions for first degree murder and armed violence. However, for the reasons stated, the defendant’s remaining aggravated battery conviction should have been reversed. Therefore, the judgment of the appellate court is affirmed in part and reversed in part and the judgment of the circuit court is affirmed in part and reversed in part.

Appellate court judgment affirmed

in part and reversed in part;

circuit court judgment affirmed in part

and reversed in part.

JUSTICE GARMAN took no part in the consideration or decision of this case.

Supplemental Opinion Upon Denial of Rehearing

On rehearing, defendant requests that this court vacate his 75-year extended-term sentence because the procedures followed by the circuit court in imposing that sentence upon him did not comply with the mandates of 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). He contends that the sentencing range for first degree murder is 20 to 60 years and that imposition of a sentence in excess of that range requires proof to a jury beyond a reasonable doubt of any factors upon which such sentence is based. Since, in his case, the extended-term sentence was based upon a post-trial finding by the circuit court that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty (see 730 ILCS 5/5–5–3.2(b)(2) (West 1994)), defendant contends that his sentence must be vacated and the cause reversed for resentencing.

The State concedes that in 
People v. Swift
, 202 Ill. 2d 378 (2002), this court held that the sentencing range for first degree murder was 20 to 60 years’ imprisonment. The State accordingly further concedes that, because defendant’s 75-year sentence was based on the circuit court’s finding that the crime was brutal and heinous, “defendant’s sentence violates 
Apprendi
.” Nevertheless, the State contends that defendant’s sentence should stand, because in this case the 
Apprendi
 violation was harmless error. The State delineates the details of the crime and argues that no reasonable jury could have failed to find beyond a reasonable doubt that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty.

In reply, defendant argues solely that an 
Apprendi
 violation falls within that narrow category of errors deemed “structural,” such that harmless-error review is inappropriate and instead reversal should be automatic. See, 
e.g.
, 
Johnson v. United States
, 520 U.S. 461, 468-69, 137 L. Ed. 2d 718, 728, 117 S. Ct. 1544, 1549-50 (1997) (summarizing cases). However, we recently addressed this precise question and concluded that 
Apprendi
 violations are 
not
 structural error, but rather are susceptible to harmless-error analysis. See 
People v. Thurow
, No. 90911 (February 6, 2003).

We note, however, that although the parties have framed this argument in terms of whether the error was “harmless,” the proper inquiry in this case is whether the 
Apprendi
 violation constituted “plain error,” because defendant did not object at the time of trial. See 
United States v. Cotton
, 535 U.S. 625, 152 L. Ed. 2d 860, 122 S. Ct. 1781 (2002) (applying plain-error test because of defendant’s failure to object at trial, even though 
Apprendi
 had not been decided until after defendant was convicted). An “important difference” between the two analyses lies in the burden of proof: in harmless-error analysis, the State must prove that the jury verdict would have been the same absent the error to avoid reversal, whereas under plain-error analysis, a defendant’s conviction and sentence will stand unless the defendant shows the error was prejudicial. See 
United States v. Olano
, 507 U.S. 725, 734, 123 L. Ed. 2d 508, 520, 113 S. Ct. 1770, 1778 (1993); 
Thurow
, slip op. at 8.

In 
Cotton
, the Court noted that “ ‘before an appellate court can correct an error not raised at trial, there must be (1) “error,” (2) that is “plain”, and (3) that “affect[s] substantial rights.” ’ [Citation.] If all ‘three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.’ ” 
Cotton
, 535 U.S. at ___, 152 L. Ed. 2d at 868, 122 S. Ct. at 1785, quoting 
Johnson
, 520 U.S. at 467, 137 L. Ed. 2d at 727, 117 S. Ct. at 1549. The Court held that “even assuming respondents’ substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings.” 
Cotton
, 535 U.S. at ___, 152 L. Ed. 2d at 868, 122 S. Ct. at 1786. The Court reached this conclusion based on the overwhelming evidence adduced.

In this case, we reach the same conclusion by the same reasoning. The undisputed forensic evidence established that defendant attacked his victim with a kitchen knife with an eight-inch-long blade. He stabbed her repeatedly about the head, neck, and body, inflicting a total of 24 stab wounds. He used such force that after his assault the knife blade was bent at a 90-degree angle. While he was stabbing her, defendant held his victim by her hair, yanking it with sufficient severity to rip out a large clump of hair with the scalp still attached. On the basis of this overwhelming evidence that the crime was brutal and heinous, there is no basis for concluding that the 
Apprendi
 violation “seriously affected the fairness, integrity or public reputation of judicial proceedings.” We have no doubt that a jury, presented with these facts, would have found that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty. Accordingly, defendant has failed to show that the error was prejudicial.

As our appellate court observed, in a case involving retroactive application of 
Apprendi
,

“there is no basis for concluding that any error seriously affected the fairness, integrity or public reputation of the judicial proceedings. Indeed, it would be the vacatur of petitioner’s sentence that would have such an effect.  Prisoners should not be misled into believing that every sentencing issue, already substantially decided a generation ago by previous fact finders, can be altered through some magic door such as 
Apprendi
. 
Talbott v. Indiana
, 226 F.3d 866, 869 (7th Cir. 2000). As the Supreme Court noted in 
Cotton
, ‘the fairness and integrity of the criminal justice system depends on meting out to those inflicting the greatest harm on society the most severe punishments.’ 
Cotton
, 535 U.S. at ___, 152 L. Ed. 2d at 869, 122 S. Ct. at 1787. ‘ “Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.” ’ 
Johnson
, 520 U.S. at 470, 137 L. Ed. 2d at 729, 117 S. Ct. at 1550, quoting R. Traynor, The Riddle of Harmless Error 50 (1970).” 
People v. Gholston
, 332 Ill. App. 3d 179, 188 (2002).

Although the procedure followed by the circuit court in sentencing defendant did violate 
Apprendi
, we conclude that the error did not rise to the level of plain error. Accordingly, defendant’s argument on rehearing does not persuade us to alter our disposition of this case.

Dissenting Opinion Upon Denial of Rehearing

JUSTICE KILBRIDE, dissenting:

Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), was rendered a dead letter in this state by a majority of this court in 
People v. Thurow
, No. 90911 (February 6, 2003). In that case, the majority wrongly held that 
Apprendi
 violations are subject to harmless error analysis. See 
Thurow
, slip op. at 20 (Kilbride, J., dissenting). By so holding, the majority essentially renders unassailable most illegally imposed extended-term sentences where a trial judge finds, by a preponderance of the evidence, the existence of an aggravating factor in violation of the sixth amendment to the United States Constitution. See, 
e.g.
, 
People v. Swift
, 202 Ill. 2d 378, 392 (2002) (finding that defendant’s crime was brutal and heinous unconstitutionally made by a trial judge).

Curiously, the majority in this case has not relied on 
Thurow
 in addressing the 
Apprendi
 violation that occurred below, despite harmless error being the only argument urged by the State. Instead, the majority, 
sua sponte
, raises and decides this case on an issue neither briefed nor argued by the parties: plain error. Perhaps the majority is hesitant to apply 
Thurow
 because doing so is essentially the same as affirming a directed verdict for the State. See 
Thurow
, slip op. at 20 (Kilbride, J., dissenting).

An equally troubling concern presented by this case is its remarkable similarity to 
People v. Swift
, 202 Ill. 2d 378 (2002), decided a mere four months ago. 
Swift
 is precisely on point and requires vacatur of defendant’s sentence. In 
Swift
, as here, the defendant failed to argue an 
Apprendi
 error before the trial court. The 
Apprendi
 violation that occurred in 
Swift
 was the very same that occurred here: a “brutal and heinous” finding made by a trial judge by a preponderance of the evidence. The 
Swift
 appellate court recognized the error, even though the defendant failed to raise the issue before the circuit court, called the error one that “affect[ed] a fundamental right,” and vacated the defendant’s extended sentence, remanding for a new sentencing hearing. 
People v. Swift
, 322 Ill. App. 3d 127, 128-31 (2001). This court affirmed. We unambiguously held that “for purposes of 
Apprendi
 analysis, the ‘sentencing range’ for first degree murder in Illinois is 20 to 60 years’ imprisonment.” 
Swift
, 202 Ill. 2d at 392. Any higher sentence based on additional factual findings “must be proven to a jury beyond a reasonable doubt.” 
Swift
, 202 Ill. 2d at 392. 

Defendant in this case received a 75-year sentence, 15 years above the prescribed maximum, based on the trial judge’s finding by a preponderance of the evidence that the crime was brutal and heinous. The evidence showed the victim had been stabbed 24 times. The defendant in 
Swift
 received an 80-year sentence, 20 years above the prescribed maximum, also based on a trial judge’s brutal and heinous finding. The victim in 
Swift
 had been stabbed 21 times. Neither defendant raised an 
Apprendi
 argument before the circuit court. Yet, the defendant’s sentence in 
Swift
 was vacated by this court in light of 
Apprendi, 
while defendant’s sentence in the controversy at hand is allowed to stand in spite of 
Apprendi
. For some reason, the majority is now willing to speculate as to what the jury might have found based on the evidence adduced at defendant’s trial, when this court was unequivocally unwilling to do so for an almost identically situated defendant in 
Swift
. We were right in 
Swift
. The majority is wrong here. Nothing justifies these diametrically opposed holdings. 
Apprendi
 errors are now, in the view of the majority, either harmless or not “plain.” As a result, defendants who have had their constitutional rights nullified by such errors will now look in vain to the sixth amendment for protection. The majority’s opinion in the instant case, as in 
Thurow
, marks a significant abrogation of our basic civil liberties and I, therefore, respectfully dissent.

FOOTNOTES
1:     
1
The State, in the appellate court, conceded that one of the convictions should merge. In its brief in this court, the State asserts that it improperly conceded this argument at the appellate court level. Although the State now believes that the merger was not proper, it accepts “the fact that it has already been conceded.”