2021 IL App (2d) 190755-U
No. 2-19-0755
Order filed July 26, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CM-338 |
| | ) | |
| SYDNEE COLLINS, | ) | Honorable |
| | ) | Joseph R. Voiland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Zenoff and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The defendant's conviction for disorderly conduct must be vacated because it was based on the same physical act as her conviction for battery.

¶ 2    The defendant, Sydnee Collins, was convicted of battery (720 ILCS 5/12-3(a)(1) (West 2016)) and disorderly conduct (720 ILCS 5/26-1 (West 2016)) after a bench trial in the circuit court of Kendall County.   She was sentenced to concurrent terms of one year of probation.   She appeals directly from the final judgment entered in the circuit court.   Collins argues her two convictions violated the one-act, one-crime doctrine because the State did not properly apportion

each offense to separate physical acts. We agree and therefore vacate Collins' conviction for disorderly conduct.

¶ 3                                        I. BACKGROUND

¶ 4     The State charged Collins with battery (720 ILCS 5/12-3(a)(1) (West 2016)) and disorderly conduct (720 ILCS 5/26-1 (West 2016)). The complaint for battery stated that Collins: "[k]nowingly without legal justification by any means cause[d] bodily harm to an individual," in that she "grabbed [the victim, Tamie] Pryor by her hair and struck Pryor several times with a closed fist." The complaint for disorderly conduct stated that Collins knowingly did "any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of peace."

¶ 5     The evidence at trial was as follows. On June 4, 2017, Pryor and her boyfriend, Paul Roush, were shopping in the pet department of the Oswego Walmart when they encountered Collins. According to Pryor and Roush, Roush made a comment to Collins, who was in their way. She was pulling items off the shelf and dropping them on the floor. After telling them she was leaving to get her boyfriend, Collins returned and threw a bag of dog toys at Pryor, almost hitting her. Pryor was shocked by this behavior. Pryor and Roush testified that, as they walked through the store, they saw Collins walking at the other end of the aisle, "keeping up with them," as they neared the entrance. They eventually lost sight of her after a few minutes.

¶ 6     About ten minutes later, Collins confronted Pryor and Roush in the bread aisle, this time accompanied by her boyfriend, Anthony Garrett. Collins and Garrett then began yelling at Pryor and Roush, accusing them of insulting Garrett and the Collins' unborn child (she was pregnant at the time). Pryor responded that Roush had been joking, and Roush apologized to Collins and Garrett. Several minutes later, Collins jumped on Pryor, grabbed her hair, and pulled Pryor down to the ground. Collins then began punching Pryor in the head, neck, and face. Garrett joined

in, also striking Pryor in the face, head, and neck multiple times. Pryor tried to defend herself, yelling at them to stop. When asked how this made her feel, Pryor testified that she feared Collins and Garrett would knock her out, and that she would choke on the partial plate in her mouth. Roush wanted to help Pryor while she was on the ground with Collins, but could not because of his back spasms, forcing him to helplessly stand and watch the altercation. Collins and Garrett only stopped once a bystander, Alva Halstead, intervened. By the time Collins and her boyfriend left Pryor and Roush, she was holding a wad of Pryor's hair, which she dropped on her way out of the store.

¶ 7    Collins disputed that she was the aggressor. Instead, she asserted she acted in self-defense. According to her, she was shopping in the pet aisle's clearance section when she heard someone behind her, presumably Pryor or Roush, telling her to get out of their way. She had accidentally dropped some items and was unable to pick them up due to her pregnancy. While Roush told Collins they were just joking, Pryor started criticizing her and calling her names. Collins apologized for dropping the items and asked why they were angry with her. A few minutes later, she threw an item in their direction, attributing her action to pregnancy hormones. Because she was upset, Collins sought her boyfriend, who was waiting in their car, to accompany her back in the store to finish their shopping.

¶ 8    According to Collins, she and Garrett encountered Pryor and Roush in the bread aisle when they returned to the store. Garrett confronted Roush about the offensive comments he had made to Collins in the pet aisle. Roush apologized and said he was joking. Pryor, however, called Garrett a racial slur. Collins and Garrett were about to leave when Pryor charged at Collins and grabbed her hair, pulling her down. Pryor then fell backwards while she kicked and pulled on Collins. Collins tried to stand back up while Garrett helped her, but Pryor was still gripping her

hair and kicking at her legs and stomach. In order to protect herself, Collins tried hitting and kicking Pryor, unsure if she hit or kicked her face in the process. During this time Collins was afraid for both herself and her unborn child. She and her boyfriend testified that, when they finally left the store, they went to their car with the intention of calling the police.

¶ 9 The police eventually arrived at the scene and an ambulance took Pryor to the hospital. She was treated for cuts and injuries to her head and jaw. She testified that her vision was blurry for about a month afterward. Photographs showed she sustained bruising to her forehead, cheek, jaw, neck, back, arms, hip area, and breast.

¶ 10 Halstead testified that he was shopping at the Walmart when he heard screaming coming from the bread aisle. Once the noise became louder, Halstead went to the bread aisle and saw Collins on top of Pryor, on the ground, pulling her hair and punching her head. At the same time, he saw Garrett spitting at Pryor and kicking her face. Halstead tried to break the fight up. Garrett told him not to touch Collins, because she was pregnant. Collins and her boyfriend then walked away and left the Walmart. Ethan Blume, another bystander who had been talking to Halstead before the altercation, also testified to hearing the commotion in the bread aisle and witnessing the physical altercation between Collins, her boyfriend, and Pryor. He could not remember, however, what happened after Halstead's attempted intervention.

¶ 11 Officer Matthew Gallup, of the Oswego police department, responded to the call at Walmart. He located and stopped the vehicle in which Collins and Garrett were spotted leaving the parking lot. Officer Gallup also obtained surveillance video from Walmart. However, because surveillance cameras did not monitor the bread aisle, there was no recording of the battery.

¶ 12 In closing arguments, the State argued that Collins' throwing items at Pryor and Roush in the pet aisle demonstrated how she had been acting as an aggressor even before the altercation in

the bread aisle. The State then argued that Collins' actions in the bread aisle of pulling Pryor's hair out and punching her constituted bodily harm. The State recounted how the altercation in the bread aisle caught Halstead and Blume's attention. Halstead testified that he heard, witnessed, and intervened in the incident that occurred in the bread aisle. He watched Collins pulling Pryor's hair while she and her boyfriend kicked Pryor on the ground. Blume also testified that he heard, and witnessed, screaming and arguing in the bread aisle, not the pet aisle. The State used the phrase "this disturbance" in referring to the events occurring in the bread aisle which attracted Halstead and Blume's attention. The State used that testimony in order to establish that there had been contact between Collins and Pryor which caused bodily harm, and thus satisfy the elements of battery.

¶ 13     In addressing the disorderly conduct charge, the State primarily referred to testimony about the altercation in the bread aisle. In the same sentence, the State contended that Collins caused bodily harm to Pryor, and that "there's no reasonable doubt that what they did alarmed and disturbed another and provoked a breach of the peace." In support of the disorderly conduct charge, the State only described how "that situation," *in the bread aisle*, frightened, alarmed, and disturbed Pryor and Roush.

¶ 14     Collins raised the claim of self-defense as to both charges. Defense counsel argued that Pryor was a mutual aggressor and Collins only used the force she believed necessary to prevent imminent harm to her and her unborn child. In support of these claims, the defense highlighted Pryor's offensive comments in the pet aisle, and argued that Collins did not intend to instigate any confrontation with Pryor and Roush.

¶ 15     The trial court did not find Collins' self-defense claim supported by any of the evidence. Instead, the trial court concluded that Pryor and Roush's testimony was more credible than

Collins', and Halstead's testimony was the most credible because he was a neutral bystander. Pryor's version was corroborated by photographs detailing the injuries she sustained during the confrontation. Collins' version of events, meanwhile, was inconsistent with the evidence. After reviewing the evidence, the trial court concluded that the State had proven her guilty of battery beyond a reasonable doubt.

¶ 16 The court then listed the elements of disorderly conduct. In finding Collins guilty of disorderly conduct, the court stated the following:

> "It is clear that based upon the Court's recitation of what happened [the Court] finds that the defendant's conduct was unreasonable, finds that it did alarm or disturb another, not only the defendant [*sic*] but multiple other people and that it did provoke a breach of the peace, so the Court finds that the State has proven beyond a reasonable doubt all of the elements necessary to convict the defendant of that charge ***."

The court noted that the one-act, one-crime doctrine might apply, but that could be discussed at sentencing.

¶ 17 On July 10, 2019, the trial court sentenced Collins to 12 months of probation, 50 hours of public service work, an anger evaluation and any prescribed treatment, restitution of $1,144, and fines and costs. Defense counsel suggested that the one-act, one-crime doctrine might apply, in which case the convictions could merge. The State replied that it was inclined to agree. The trial court stated that it believed there were "different elements to each offense," but if the State was willing to have the two convictions merge, it had no objection. Otherwise, it would impose concurrent sentences. It concluded that it believed the case "is not a situation where one act one crime applies but it is up to the State. If they wish to merge them into just the one and have an entry of one conviction in this matter on the battery, I am not going to oppose the State." The

State then indicated it would add the disorderly conduct conviction to the sentencing order for the battery conviction with the note that it was "the Court's inclination that it does not merge." The trial court confirmed that it had found Collins guilty on both counts. The sentencing order listed both the battery and disorderly conduct convictions, imposing concurrent sentences of 12 months of probation.

¶ 18    Collins filed a motion to reconsider sentence that did not raise any issue regarding the one-act, one-crime doctrine.[1]    Aside from certain modifications to the restitution order, the trial court denied the motion.    This appeal followed.

¶ 19                                    II. ANALYSIS

¶ 20    Collins argues that her conviction for disorderly conduct violates the one-act, one-crime doctrine and should therefore be vacated by this Court.    The State contends that she was correctly charged and convicted because she committed multiple acts supporting the two offenses.    The State points to the evidence at trial, the closing arguments, and the trial court's findings as establishing and delineating between multiple acts for each offense, specifically between the events occurring in the pet aisle and those that occurred in the bread aisle.    Collins characterizes the State's brief as attempting to retroactively apportion her conduct on appeal.

¶ 21    We review this issue, which is a question of law, *de novo*.    *People v. Boyd*, 307 Ill. App. 3d 991, 998 (1999).    Under the one-act, one-crime doctrine, a defendant "may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act."

_____

    [1] Even though this issue was not preserved at trial by the defendant, one-act, one-crime violations qualify as plain errors, which can be reviewed even if unpreserved. *People v. Coats*, 2018 IL 121926, ¶ 12; *People v. Harvey*, 211 Ill. 2d 368, 388-89 (2004).

*People v. Coats*, 2018 IL 121926, ¶ 11.    Although a defendant can be prosecuted for multiple offenses if the same physical act formed the basis for those offenses, only one conviction and sentence may be imposed.    *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996); *People v. Segara*, 126 Ill. 2d 70, 76-77 (1988).

¶ 22    One-act, one-crime questions typically carry a two-step analysis.    A court must first determine whether the defendant's conduct stems from one physical act or several separate acts. *Rodriguez*, 169 Ill. 2d at 186.    If the defendant committed multiple separate acts, then the court must go on to determine whether any of the charged offenses are lesser included offenses.    *Id*. If so, then the lesser included offense must be vacated.    *Id*.; see also *People v. Johnson*, 237 Ill. 2d 81, 97 (2010).    Here, Collins argues only that the State charged her for multiple offenses based on the same act.    Accordingly, our analysis does not extend to the second step of the standard one-act, one-crime analysis.

¶ 23    In order to properly convict a defendant of multiple offenses stemming from related acts, the State must apportion separate acts to each offense in the charging instrument and at trial. *People v. Crespo*, 203 Ill. 2d 335, 342-43 (2001).    We must, therefore, determine whether the State properly apportioned Collins' acts to the charged offenses.

¶ 24    In *Crespo*, the defendant was convicted of one count of armed violence and two counts of aggravated battery, having stabbed the victim three times.    *Id*. at 337-38.    The indictment did not differentiate between the separate stab wounds.    *Id*. at 342.    The armed violence charge recited only that the defendant had committed aggravated battery while armed with a knife, and the two the aggravated battery counts simply alleged that the defendant stabbed the victim with a knife.    *Id*. at 343.    The Illinois Supreme Court held that the State failed to apportion the three stab wounds among the three separate offenses of which the defendant was convicted.    The court

held that the language of the indictment did not adequately apportion the offenses among the multiple stabs. *Id*. at 342-43. The State only presented to the jury its theory that the three stab wounds constituted bodily harm; it neither argued, nor presented evidence, that only one of the wounds would be enough for a conviction. *Id.* at 344. The court in *Crespo* emphasized that the State could have chosen to charge the defendant, and argue at trial, that each stab wound constituted a separate offense, but that the State chose not to do so. *Id.*

¶ 25 Under *Crespo*, courts must look both to the charging instrument, as well as the evidence and arguments at trial when determining whether the State properly apportioned charges. For instance, in *In re Samantha V.*, 234 Ill. 2d 359, 377-78 (2009), the defendant's convictions violated the one-act, one-crime principle where the State did not differentiate between different strikes and blows to the victim either in the language of the charging document or at trial. The supreme court noted that the State repeatedly referred to both counts as "this incident" in closing arguments. *Id.* at 377. Upholding multiple convictions where there was insufficient apportionment would be unfair, as it would infringe upon the right of the accused to be informed of the nature of the charges against her. *Id.* at 378.

¶ 26 In applying the relevant case law here, we begin by considering whether the State properly apportioned Collins' acts in the charging instrument. This question often comes down to the specific language used. For example, multiple convictions have been upheld where the State labeled separate attempts at aggravated criminal sexual assault as the "first" attempt and "second" attempt in the charging instrument and the verdict forms. *People v. Witherspoon*, 379 Ill. App. 3d 298, 305-06 (2008). Courts have also upheld multiple convictions under the one-act, one-crime doctrine when the State clearly distinguished between separate, discrete acts in both the charging instrument and in the framing of testimony at trial. In *People v. Williams*, 384 Ill. App.

3d 327, 340 (2008), the State charged the defendant with "aggravated battery based on holding a knife to [the victim's] throat and with domestic battery for putting his hands around [the victim's] neck." The reviewing court determined that "the evidence adduced at trial indicated discreet [*sic*], insulting, or provocative acts for" each charge. *Id*. This included both the victim's testimony and the prosecutor's arguments clearly distinguishing between the choking and the knife held to the victim's head. *Id*.

¶ 27 On the other hand, courts may vacate convictions as violating the one-act, one-crime principle when the State fails to apportion separate acts among the charges. In *People v. Williams*, 2017 IL App (3d) 140841, the court concluded that the defendant's two convictions for aggravated battery were premised on the same physical act—striking the victim with a baseball bat. *Id*. ¶¶ 3, 33. The court pointed out that the phrase "struck [the victim] about the body with a bat" was repeated in both counts of the indictment, and that the State made no attempt to "apportion these offenses by providing distinct striking locations or resulting injuries," nor did the State "argue at trial that each count was directed at a different blow or injury location." *Id*. ¶ 33. For those reasons, the court determined the defendant lacked the necessary notice that the prosecution intended to treat her actions as separate. *Id.* Thus, the court vacated one of the convictions. *Id.*

¶ 28 Here, the State charged Collins with battery and disorderly conduct. The complaint for battery alleged that Collins' act of grabbing Pryor's hair and striking her with a closed fist caused bodily harm. The complaint for disorderly conduct, on the other hand, merely recited the elements of the offense, without specifically tying it to any specific act committed by Collins. In this way, the State failed to differentiate between separate acts committed by Collins in the

charging instrument. See *In re Samantha V.*, 234 Ill. 2d at 377-78; *Williams*, 2017 IL App (3d) 140841, ¶ 33.

¶ 29    The State's presentation of evidence at trial and its argument also failed to apportion Collins' conduct between the different offenses. One commits disorderly conduct when he or she knowingly "[d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1 (West 2016). The State did not adequately link any evidence or testimony at trial to the statutory elements of disorderly conduct in establishing that Collins committed disorderly conduct in the pet aisle. Pryor's statement that she was "shocked" Collins threw a bag of dog toys at her was the only testimony that remotely alluded to the elements of disorderly conduct. Only she and Roush were present when Collins threw the bag.

¶ 30    Moreover, the State repeatedly referred to "what they [Collins and her boyfriend] did" and "that situation" in the bread aisle when discussing the disorderly conduct charge. In closing arguments, the State focused heavily on the battery charge, emphasizing how Collins' actions constituted bodily harm. The disorderly conduct charge was only cursorily discussed. There was no mention of any specific act, *separate from those constituting the battery charge*, committed by Collins that would have satisfied the elements of the crime. In fact, the State argues there was a breach of the peace because Halstead felt the need to intervene in the bread aisle altercation—the same incident forming the basis of the underlying battery charge. Furthermore, the State's reference to Pryor's fear and Roush's concern that night stems from the events occurring in the bread aisle, which were charged as battery. In summary, the State premised the disorderly conduct charge on the same physical actions as the battery charge. See *Williams*, 2017 IL App (3d) 140841, ¶¶ 3, 33.

¶ 31    The State argues the acts committed by Collins in the pet aisle were clearly separate from those that occurred in the bread aisle.   However, the only testimony that specifically addressed the confrontation in the pet aisle was used for purposes of demonstrating Collins' behavior in the store before the altercation in the bread aisle.   The State did not use that testimony to establish the elements of disorderly conduct.   The actions that caused the disturbance to others, namely Halstead, were the same ones which constituted the battery in the bread aisle.   The trial court, in finding Collins guilty of disorderly conduct, reiterated the elements of the crime without offering any specific finding regarding which physical act composed the offense.   In doing so, the trial court failed to provide any distinction between the physical acts forming the basis of the battery and disorderly conduct charges.   See *Witherspoon*, 379 Ill. App. 3d at 298; *Williams*, 384 Ill. App. 3d at 327.   Thus, the separate physical acts committed by Collins were not properly apportioned between the charged offenses.   See *Crespo*, 203 Ill. 2d at 342-43.

¶ 32    The State, pointing to *Rodriguez*, *People v. Dixon*, 91 Ill. 2d 346 (1982), and *People v. Marston*, 353 Ill. App. 3d 513 (2004), correctly argues that a series of acts can still support multiple convictions.   However, the State neglects the proper apportionment threshold set forth by the aforementioned case law concerning the one-act, one-crime doctrine.   In each of those cases, the reviewing court held that the defendant had committed separate acts—separate acts which had been properly apportioned into separate offenses.   Here, they were not.   Instead, the State attempts to apportion Collins' actions to distinct offenses for the first time on appeal.   To ignore the State's improper apportionment in this case would jeopardize Collins' fundamental right to be provided fair notice of the nature of the criminal accusations made against her.   See *Crespo*, 203 Ill. 2d at 344.

¶ 33                                        III. CONCLUSION

¶ 34    For the foregoing reasons, we affirm Collins' conviction for battery but vacate her conviction for disorderly conduct for violating one-act, one-crime principles.

¶ 35    Affirmed in part and vacated in part.