2026 IL App (1st) 240115-U

FIRST DIVISION
June 15, 2026

No. 1-24-0115

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 22 CR 0393001 |
| ROBERTO ROSADO, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Michael J. Hood, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*:   The defendant's two stalking convictions were not predicated on the same physical act, and therefore did not violate the one-act, one-crime rule. The defendant's concurrent sentences of five years' probation exceeded the maximum authorized by statute and are therefore reduced to 30 months. See 720 ILCS 5/12-7.3(b) (West 2022); 730 ILCS 5/5-4.5-45(d) (West 2022).

¶ 2    Following a bench trial in the circuit court of Cook County, the defendant, Roberto Rosado,

was found guilty of two counts of stalking (720 ILCS 5/12-7.3(a)(1), (a-3)(2) (West 2022)) and sentenced to five years of probation. On appeal, the defendant contends: (1) that one of his stalking convictions should be vacated under the one-act one-crime rule; and (2) that his five-year probation sentence imposed for a Class 4 felony is not authorized under Illinois law. For the following reasons, we affirm the defendant's convictions and reduce his sentence.

¶ 3                                    I. BACKGROUND

¶ 4      On April 5, 2022, the 58-year-old defendant was charged with two counts of stalking the 33-year-old victim, Analiza Mercado. Count I charged the defendant with knowingly engaging in a course of conduct, *to wit* appearing "around the victim's residence on numerous occasions," which he knew or should have known would cause a reasonable person to fear for her safety. See 720 ILCS 5/12-7.3(a)(1) (West 2022). Count II charged the defendant with knowingly, and without lawful justification, "follow[ing] or plac[ing]" the victim "under surveillance by placing multiple GPS trackers" on her vehicle "on at least two separate occasions" between December 8, 2021, and February 18, 2022, thereby placing her in reasonable apprehension of immediate or future restraint. See 720 ILCS 5/12-7.3(a-3)(2) (West 2022).

¶ 5      The defendant proceeded to a bench trial at which the following relevant evidence was adduced. In December 2021, the victim lived in a second-floor unit of an apartment building located at 3804 West Montrose Avenue in Chicago. The building's ground floor was occupied by a flower shop, which was run by Hanna Hackman Esparza, who was friendly with the victim. The victim did not know the defendant but had seen him in the neighborhood while walking her dog because he often stood in front of a residential building across the street. On one such occasion, the defendant offered the victim jewelry, and on another loudly told her that his dog had been taken away.

¶ 6 On December 8, 2021, the victim was sitting alone inside her car in her building's private parking lot when the defendant "popped up" next to her, and "waved her down," catching her off guard. After the victim rolled down her window, the defendant offered her a jewelry box telling her that it was a Christmas gift. The victim politely declined and told the defendant that she was in a hurry. The defendant then asked her for directions to Long Grove, where she had visited a friend the previous weekend. When the victim responded that she was not good with directions and used the GPS on her phone to get around, the defendant told her that he "sees [her] driving around everywhere." He then mentioned a specific address (60 East Delaware) where he claimed to have seen her. The victim, who had been at that address recently was "taken aback" and told him he must be mistaken. She then reiterated that she was in a hurry and drove off. While at first the victim thought nothing of this encounter, when the defendant mentioned the specific place where he had seen her, she was "very frightened" and subsequently discussed the incident with Esparza.

¶ 7 On the following day, December 9, 2021, the defendant entered Esparza's flower shop on the ground floor of the building in which the defendant lived, showed her his identification card (which Esparza found to be strange) and telephone number (773-\*\*\*-6065) and asked her for information about a young Hispanic woman who lived upstairs. The defendant did not know the woman's name or her exact address but told Esparza which unit he believed she lived in. Esparza testified that she knew that the defendant was referring to the victim because the victim was the only young Hispanic woman who lived in the building. The defendant offered to pay cash if Esparza would deliver a flower arrangement to the victim and provide "more information about her." Esparza then texted the victim, who instructed Esparza not to accept the flower request. After the defendant entered the shop several times that day asking for the same information, Esparza

called her landlord, whereupon the defendant left.

¶ 8    Esparza testified that a few days later, on December 11, 2021, the defendant again entered her shop asking her to deliver flowers to the victim and provide him with information about her. This time, the defendant knew the victim's name and "claimed to know which unit was hers." Esparza refused but asked the defendant to confirm his telephone number, which she then texted to the victim. Throughout that day, the defendant continued to telephone and enter the flower shop making the same request. At about 5:30 p.m., Esparza locked the shop to keep the defendant out. Subsequently, the defendant appeared outside, "banging on the glass" and "[c]alling the shop phone over and over again." Esparza, who was working alone and was concerned for her safety, hid in the restroom, where she could not be seen by the defendant, and called the police. The defendant left before the police arrived. Esparza again notified the victim.

¶ 9    While Esperanza could not remember the exact number of times she spoke to the defendant, she testified that between December 9 and December 11, 2021, he entered her shop over six times.

¶ 10    Evidence at trial further established that on January 13, 2022, the victim was in a bar called Sutherland's when the bartender made an announcement asking if anyone by the victim's name was inside the bar. When the victim indicated that that was her name, the bartender handed her a phone and told her that "[her father] Juan Mercado was on the phone looking for [her]" and "want[ed] to make sure [she] was okay." The victim took the phone, which showed the caller's number as "private," and said "hello" but received no response. The victim testified that her father's name was Juan Mercado, but that she knew he was not the caller because she had not told him where she was going and because he would never call her at a bar. The victim subsequently spoke with her father and confirmed that he had not phoned her.

¶ 11    On the following morning, January 14, 2022, the victim's boyfriend found two tracking

devices wedged between the hood and windshield of the victim's car and removed them. The victim immediately notified the police and took the trackers to the police station. On February 18, 2022, the victim inspected her car again and found a third tracking device in the back right wheel well. She called the police, who removed it. The victim testified that after the discovery of the trackers and the incident at Sutherland's Bar, she was terrified that the defendant wanted "to rape or kill" her and felt unsafe in her apartment. She therefore moved into a temporary residence and purchased a new car.

¶ 12 The police subsequently obtained video surveillance footage of the parking lot behind the victim's residence. That footage showed the defendant approaching the victim in her car on December 8, 2021, and a man wearing gray jeans and a black hooded sweatshirt, identical to the ones worn by the defendant on December 8, crouching down and out of view near the right rear wheel of the victim's car in the early morning hours of February 18, 2022.

¶ 13 The police also subsequently obtained search warrants for the three tracking devices recovered from the victim's car and the telephone number that the defendant gave Esparza in the flower shop. The results of these warrants revealed that the first tracker (recovered from the victim's windshield) was a CoolPad device associated with T-Mobile telephone number 773-***-5003, which was owned by the defendant. The second tracker (recovered from the victim's windshield) was a Spytec device linked to the defendant's Amazon account and associated with the telephone number that the defendant had given Esparza (773-***-6065). The third tracker (recovered from the victim's wheel well) "came back to *** a shell company" and could not be traced.

¶ 14 In addition, telephone records from the telephone number that the defendant had given Esparza (773-***-6065) revealed that on the evening of January 13, 2022, a phone call was made

from that number to Sutherland's Bar with the use of the "star 67" function to conceal the caller's identity.

¶ 15    Based on the aforementioned evidence, the circuit court found the defendant guilty of both counts of stalking. As to count I, the court found that the defendant knew or should have known that he was creating a fear in the victim when he appeared around her residence on numerous occasions. In this respect, the court found the victim to be "a very credible witness" and that her fear of the defendant was both explicitly testified to and palpable from her demeanor during the court proceedings. The court found that the evidence at trial overwhelmingly established that the defendant fixated on the victim and engaged in a systematic pattern of stalking her by repeatedly popping up around her residence, offering her jewelry, harassing the florist for information about her, and virtually stalking her father's name so as to impersonate him in a phone call.

¶ 16    As to count II, the court found that the evidence overwhelmingly established that on two separate occasions the defendant followed or placed the victim under surveillance by placing multiple tracking devices on her vehicle. In this respect, the court noted that by the time the defendant approached the victim in her car on December 8, he must have already been tracking her movements since he knew that she had been in Long Grove. As the court explained:

"[T]echnolgy is a funny thing. It used to be when we were young, that to follow somebody, you followed them. You don't need to do that anymore. You can creep up in the dark of night and place something on their car and then go back to your house and follow them all you want, and that's what [the defendant] did. He knew she was in Long Grove before she knew that anybody knew she was in Long Grove."

¶ 17    At the subsequent sentencing hearing, in aggravation, the State presented a victim impact statement in which the victim explained that the defendant's stalking had caused her to become

"paranoid" and "struggle [with] interacting with others." According to the victim, even after "uprooting" her life by breaking her lease, moving to a new home, and buying a new car, she feared for her safety and that of her family and friends because the defendant had repeatedly tracked her location. Her "mental health was falling apart," and she continued to "look over [her] shoulder" and check her car for tracking devices on a daily basis.

¶ 18    The State recommended that the defendant be sentenced to 642 days of imprisonment, "time considered served," and a five-year term of probation with reporting, GPS monitoring, a mental health evaluation and treatment. The defendant declined to make a statement in allocution.

¶ 19    After hearing the parties' arguments, the court noted that the defendant's behavior was "disturbing" and that he had expressed no remorse for his behavior, by which he had stolen the victim's "peace of mind" and her ability to feel safe, "possibly [for] the rest of her life." The court further noted that it was concerned about what the defendant would do and how the victim would live now that the defendant would be released from jail. The defendant then interrupted the court and stated that he "never *** disrespect[ed] that woman." When the court noted that defendant had placed tracking devices on the victim's car, the defendant responded, "It was not proven *** in court, your Honor."

¶ 20    The court subsequently sentenced the defendant to two concurrent 642-day terms of imprisonment with credit for 642 days of time served and two concurrent five-year terms of probation. The court ordered that the defendant "wear a GPS device" for the entirety of those five years to give the victim "some satisfaction or maybe a feeling of safety." The court also entered a separate and indefinite no-contact order. The defendant now appeals.

¶ 21                                    II. ANALYSIS

¶ 22                             1. One-Act, One Crime

¶ 23     On appeal, the defendant does not challenge the sufficiency of the evidence to convict him. Instead, he solely contends that one of his stalking convictions must be vacated because it violates the one-act, one-crime rule. The State initially responds, and the defendant concedes, that he forfeited this issue by failing to properly preserve it for appellate review. See *People v. Sebby,* 2017 IL 119445, ¶ 48 (To preserve an issue for purposes of appeal, the defendant was required to make a contemporaneous objection at trial and to raise the issue in a posttrial motion). The defendant nevertheless asserts that we should review this issue under the second prong of the plain error doctrine. See *People v. Herron*, 215 Ill. 2d 167, 177 (2005).

¶ 24     The plain error doctrine is a narrow and limited exception to the general rule of forfeiture (*People v. Bowman,* 2012 IL App (1st) 102010, ¶ 29 (citing *Herron,* 215 Ill. 2d at 177)), which allows a reviewing court to consider unpreserved error when a "clear or obvious" error occurred and: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski,* 225 Ill. 2d 551, 565 (2007) (citing *Herron,* 215 Ill. 2d at 186–87). Our supreme court has repeatedly held that "[a]n alleged one-act, one-crime violation is reviewable under the second prong of the plain-error doctrine because it affects the integrity of the judicial process." *People v. Smith*, 2019 IL 123901, ¶ 14; see also *People v. Coates*, 2018 IL121926, ¶ 10; see also *People v. Harvey*, 211 Ill. 2d 368, 389 (2004).

¶ 25     Nonetheless, because "there can be no plain error if there was no error at all," the first step in our analysis is to determine whether any error occurred. *People v. Wilson,* 404 Ill. App. 3d 244,

247 (2010); *Lewis,* 234 Ill. 2d at 43. This, of course, requires us to take "a substantive look" at the issue raised on appeal. *People v. Johnson,* 208 Ill. 2d 53, 64 (2003).

¶ 26     The one-act, one-crime rule prohibits convictions for multiple offenses based on precisely the same physical act.  See *People v. King*, 66 Ill. 2d 551, 566 (1977); *People v. Kuntu*, 196 Ill. 2d 105, 130 (2001); see also *People v. Segara*, 126 Ill. 2d 70, 77 (1988) (holding that if the same physical act forms the basis for two separate offenses charged, a defendant can be prosecuted for each offense, but only one conviction and sentence may be imposed); see also *People v. Garcia*, 179 Ill. 2d 55, 71 (1997) (holding that where guilty verdicts are obtained for multiple counts arising from the same act, a sentence should be imposed on the most serious offense). Whether there has been a violation of the rule is a "question of law, which we review *de novo.*" *People v. Coats*, 2018 IL 121926, ¶ 12; see also *People v. Miller*, 238 Ill. 2d 161, 173-75 (2010).

¶ 27     In considering whether a violation of the rule occurred, we first determine whether the defendant's conduct involved multiple acts or a single act. *Id*. Multiple convictions are improper either if they are based on a single act or, if based on multiple acts, any of the offenses are lesser-included. *Id*. An "act" is defined as "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566; see also *People v. Crespo,* 203 Ill.2d 335, 341 (2001).

¶ 28     In order for multiple convictions to stand, a charging instrument must indicate that the State intended to treat the defendant's conduct as multiple acts. *Crespo,* 203 Ill. 2d at 345. The State's intent, as reflected in the wording of the charging instrument, is a significant factor in deciding whether the defendant's conduct constitutes separate acts capable of multiple convictions. *People v. Pulgar,* 323 Ill.App.3d 1001, 1011 (2001).

¶ 29     Moreover, even where a common act is part of two offenses or is part of one offense and the only act of another, multiple convictions can stand. *People v. Hagler,* 402 Ill.App.3d 149,

153 (2010). Sharing a common act does not require that one of the two convictions be vacated, so long as one of the offenses requires proof of an additional act. *Hagler,* 402 Ill.App.3d at 154; *People v. Marston,* 353 Ill. App. 3d 513, 516-19 (2004).

¶ 30     In the present case, the defendant argues that his stalking convictions violate the one-act, one-crime rule because they are predicated on the same physical act of installing tracking devices on the victim's vehicle. In this respect, the defendant argues that apart from this one act, the remainder of the evidence supporting his convictions (namely, his conversations with the victim inside her vehicle, his requests for information about the victim from the flower shop proprietor, and his impersonation of the victim's father to Sutherland's bartender) constituted protected speech under the First Amendment. The State concedes that a stalking conviction cannot be premised on protected speech,[1] but contends that the defendant's criminal conduct consisted of numerous distinct physical acts that did not implicate the First Amendment. For the following reasons, we agree with the State.

¶ 31     In the present case, the defendant's stalking charges entailed different elements. To succeed on count I, the State was required to prove that the defendant knowingly engaged in "a course of conduct," *i.e.*, "[two] or more acts," including but not limited to those by which he "directly, indirectly, or through third parties" and "by any action, method, device, or means," "follow[ed], monitor[ed], observ[ed], surveill[ed], threaten[ed] \*\*\* or engaged in other non-consensual

---

[1] See *People v. Releford*, 2017 IL 121094, ¶¶ 63, 65 (holding that the phrase "to communicate to or about" in the "course of conduct" element of the stalking statute is unconstitutional because it criminalizes protected speech); *People v. Ashely*, 2020 IL 123989, ¶¶ 31, 47 (holding that the only form of "communication" that may be constitutionally criminalized under the stalking statute is a "true threat," *i.e.*, one that encompasses serious expressions of an intent to commit an act of unlawful violence, and that cannot be satisfied with the "negligent mental state of 'should know,' " but instead requires "an intentional or a knowing mental state.")

contact" with the victim, which he knew or should have known "would cause a reasonable person to fear for *** her safety" (720 ILCS 5/12-7.3(a)(1) (West 2022)); 720 ILCS 5/12-7.3(a)(1), (c)(1) (West 2022). Here, the State explicitly alleged that this "course of conduct" involved the defendant "appearing around the victim's residence on numerous occasions."

¶ 32    In contrast, to succeed on count II, the State was required to prove that "on at least [two] separate occasions," the defendant knowingly followed or placed the victim under surveillance thereby placing her "in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint[.]" (720 ILCS 5/12-7.3(a-3)(2) (West 2022). To show that the defendant "followed or placed the victim under surveillance," the State had to show either that he remained present outside her "school, place of employment, vehicle, other place occupied by [her], [or her] residence," or that he placed "an electronic tracking device on the [victim's] person or [her] property." 720 ILCS 5/12-7.3(c-7) (West 2022). Here, the indictment explicitly alleged that the defendant did so by "placing multiple GPS trackers" on her vehicle "on at least two separate occasions" between December 8, 2021, and February 18, 2022. See 720 ILCS 5/12-7.3(a-3)(2) (West 2022).

¶ 33    Contrary to the defendant's position, a review of the undisputed evidence presented at trial reveals that the stalking convictions were not solely predicated on the defendant's installation of the tracking devices, and that instead, the defendant's criminal conduct consisted of numerous physical acts which did not involve protected speech.

¶ 34    The evidence at trial established that the defendant, with whom the victim was not acquainted but merely recognized from the neighborhood, installed three distinct tracking devices on her vehicle over a three-month period. The defendant placed the first two tracking devices on the victim's windshield sometime prior to January 14, 2022, and once they were discovered and

removed, hid a third tracking device inside her vehicle's rear wheel well on February 18, 2022. In addition, the defendant physically followed or tracked the victim on at least four separate occasions. Prior to December 8, 2021, he trailed her to Long Grove, and East Delaware Street. On December 8, 2021, he followed her home, lurking in her parking lot, and abruptly accosted her while she was sitting inside her vehicle, holding out a jewelry box for her as a gift. A month later, on January 13, 2022, he again tracked her to Sutherland's Bar. Moreover, between December 9, 2021, and December 11, 2021, the defendant appeared in the vicinity of the victim's residence over six times, repeatedly frequenting the flower shop on the ground floor of her building in an attempt to have flowers delivered to her residence upstairs, and banging on the front door after the proprietor, instructed by the victim not to accept the flowers, locked her shop in an attempt to evade him.

¶ 35    Contrary to the defendant's assertion, while his conversations with the victim and the flower shop owner constitute protected speech, his actions surrounding both encounters (*i.e.*, trailing the victim into her private parking lot, lurking next to her vehicle, repeatedly appearing in and around her building, and banging on the flower shop door beneath her apartment) do not. *See e.g., Coutant* v. *Durrell*, 2021 IL App (3d) 210255, ¶ 76 ("following, monitoring, observing, surveilling, or interfering with a person" is not speech); *Nicholson v. Wilson*, 2013 IL App (3d) 110517, ¶ 20 (same). The same applies to the defendant's conduct with respect to tracking the victim to Sutherland's Bar and using her father's name to impersonate him. See *e.g.*, *Commonwealth v. Crawford*, 254 A.3d 769, 779 (Pa. Super. Ct. 2021) ("[I]mpersonation done with the intent to obtain some benefit *** is a form of fraud, which has historically been unprotected speech under the First Amendment."); *State v. Shields*, 56 P.3d 937, 941 (Or. Ct. App. 2002) ("making telephone calls without speaking" is not protected speech); *see also Coutant*, 2021

IL App (3d) 210255, ¶ 75 ("making unwanted phone calls" constitutes "stalking behavior").

¶ 36    Under this record, we are unpersuaded by the defendant's assertion that his convictions were predicated on a single physical act. Instead, count I alleging a "course of conduct" based on the defendant appearing in the vicinity of the victim's residence on numerous occasions was predicated on the defendant: (1) physically following the victim and lurking next to her vehicle on December 8, 2021; (2) frequenting the victim's building over six times between December 9, and 11, 2021; and (3) crouching next to the victim's vehicle and installing the third tracking device on her wheel in the early morning hours of February 18, 2022. In contrast, count II alleging that the defendant "followed or placed the victim under surveillance" on at least two separate occasions by "placing multiple GPS trackers" on her vehicle was predicated on the defendant: (1) placing two different trackers on the victim's windshield prior to January 14, 2022; and (2) using these devices to follow the victim to Long Grove, East Delaware Street, and Sutherland's Bar.

¶ 37    Accordingly, because the two stalking convictions were predicated on multiple acts instead of one, we find that they do not violate the one-act, one-crime rule. Since we conclude that there was no error, we must also find that there is no plain error justifying review. See *Wilson,* 404 Ill. App. 3d at 247 ("there can be no plain error if there was no error at all.")

¶ 38                                   2. Sentencing

¶ 39    On appeal, the defendant next contends, and the State concedes, that his five-year probation term exceeded the maximum allowed by statute for his conviction. It is undisputed that, as charged, the stalking convictions are Class 4 felonies. See 720 ILCS 5/12-7.3(b) (first conviction of stalking is a Class 4 felony). The statutory maximum probation term for a Class 4 felony is 30 months. See 730 ILCS 5/5-4.5-45(d) (West 2022). Accordingly, we accept the State's concession, and per the parties' request, reduce the defendant's probation term to 30 months. See Ill. S. Ct. R. 615(b)(4).

¶ 40                                    III. CONCLUSION

¶ 41    For these reasons, we affirm the defendant's convictions and order his sentence reduced to

a term of 30 months' probation.

¶ 42    Affirmed; sentence reduced.