NOTICE
Decision filed 05/05/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220370-U

NO. 5-22-0370

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 14-CF-713 |
| | ) | |
| FRANKLIN L. SMALL JR., | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1 *Held*: Defendant's conviction is affirmed where sufficient evidence is found to establish defendant's intent to kill the victim to support the attempted murder conviction, no *per se* conflict existed, and the one-act, one-crime doctrine was not violated. However, defendant's sentence for aggravated battery is modified to run concurrent to the Moultrie County conviction in case No. 14-CF-28.

¶ 2 Following a bench trial, defendant, Franklin L. Small Jr., was convicted of attempted murder in violation of sections 8-4(a) and 9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)) and aggravated domestic battery in violation of section 12-3.3 of the Code (*id.* § 12-3.3). He was sentenced to seven years for the attempted murder conviction and six years for aggravated domestic battery with the sentences to run consecutive to each other as well as the sentence imposed in Moultrie County case No. 14-CF-28. Defendant appeals the conviction arguing that the State failed to prove intent to kill, his counsel had a *per se* conflict, and

1

the one-act, one-crime doctrine was violated based on the dual convictions. He also appeals his sentence arguing that the aggravated domestic battery conviction was improperly ordered to run consecutively to his Moultrie County sentence.

¶ 3                                     I. BACKGROUND

¶ 4     On June 24, 2014, defendant was charged, by information, with two counts. Count I alleged attempted first degree murder in that defendant, "without lawful justification and with the intent to kill Adelle Small, repeatedly cut Adelle Small with a knife and stomped on her face while threatening to kill" her. Count II alleged aggravated domestic battery and alleged defendant "struck [and] repeatedly cut Adelle Small with a knife, causing a finger fracture and multiple lacerations which required medical *** stitches and/or staples to close, and the conduct was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 5     The charges stemmed from an incident on June 17, 2014, at which time Decatur police were dispatched on a domestic violence call. Upon arrival, the officers located the victim lying back in a chair with blood on her and the surrounding area. Adelle Small advised the officers that her husband, the defendant herein, stabbed her multiple times with a large butcher knife and stomped on her face all the while threatening to kill her. Adelle was transported to St. Mary's Hospital where she received staples on the back of her head and was later transferred to Carle Hospital for treatment for her finger. Defendant was arrested later that day in Moultrie County.

¶ 6     A public defender was appointed on July 29, 2014, but the appointment was revoked after defendant obtained privately retained counsel, Charles Lukis. On March 19, 2015, defense counsel requested a jury trial, and the trial was set for May 18, 2015. On May 18, 2015, defense counsel requested a bench trial. Defendant was queried regarding the request and his responses revealed a desire for a bench trial. The trial began that afternoon.

¶ 7    The State called Adelle, who testified that divorce proceedings between the parties were initiated in February 2014, a hearing was held on June 16, 2014, and she went to work the following day. She spoke with defendant on June 17, 2014, by telephone and he was screaming and crying. She stated defendant's words scared her, but she thought he was in Vandalia. Adelle's sister, Wendy Boaz, left the business after the telephone call and Adelle was alone. Around 4 p.m., defendant arrived at the business, and Adelle locked the door. Defendant came to the door and knocked. Adelle told defendant that he was scaring her and offered to meet him at a local public restaurant. She testified that defendant walked back to the car, got a hunting knife, and started banging on the door with the knife. She went to the other side of the office where there was a window and opened it so she could jump out and get to her car. When defendant saw Adelle open the window, he ran around the building to the open window. Before she could shut and lock the window, defendant "swung the knife through the window" and cut her arm.

¶ 8    Adelle testified that she then ran to the counter in the building and tried to escape through the front door while defendant came through the window stating he was going to kill her. She stated defendant's exact words were, "I'm gonna fucking kill you." Adelle stated that she was able to get to the front door, but it would not open. As she was trying to open the door, defendant stabbed her in the back of the head. He then grabbed her hair and pulled her head back. Defendant took the knife and cut across her chin while she tried to push the knife away. Her hand was against her face trying to push the knife away and her hand was also cut. Defendant began hitting her with his fist on her head and she fell to the ground. Defendant then began stomping on her face and told her "to take my last breath." She acted like she was dead by trying to slow her breathing down, not moving, closing her eyes, and keeping her hands on the ground, instead of covering her face, while he stomped on her face three or four more times. Thereafter, defendant left through the window.

3

As soon as she heard the car start outside, Adelle ran to the phone and called 911. She sat down in the chair because she was dizzy and bleeding. She stayed on the phone until police and paramedics arrived. She was taken to St. Mary's Hospital where they stapled the back of her head and stitched her elbow. She was directed to go to Carle Hospital to get stitches for her chin and finger because they needed a plastic surgeon. Thereafter, Adelle's 911 call was played.

¶ 9    Adelle further stated that the cut on her pinky went to the bone. She identified her injuries in the photographs as well as the damage to the office. She stated that she has scars on the back of her head and her chin. The lacerations on her forehead and nose were from defendant's foot. The cut on her forearm was caused by defendant's initial strike when she was by the window. She had a scar on her pinky and had no feeling in the tip of her pinky finger following the incident.

¶ 10    On cross-examination, Adelle stated that defendant filed the petition for dissolution and could not remember exactly what defendant stated on the earlier telephone call. She stated that when defendant came back from the car with the hunting knife, she told him she was going to call the police because she already had a "no trespass" order against him. She stated the entire knife was a little longer than a foot when fully extended and the blade was longer than the handle. She was familiar with the knife because her mother bought it for defendant 10 years earlier at an auction. She did not know if her elbow was cut by the knife or broken glass but knew he used the knife on her head because she could feel the metal on her skull. She further stated that when defendant pulled her head back, she cringed to keep him from cutting her neck.

¶ 11    The State called Adelle's sister, Wendy Boaz, who also worked at the business. Ms. Boaz testified about the earlier telephone call between defendant and Adelle as well as her sister's condition when she returned to the business. The State called Detective Scott Cline, who testified that he processed the crime scene and took photographs at the business. He stated the device to

4

record surveillance at the business was unplugged and did not know if any footage of the event was on the device. On cross-examination, he confirmed that he searched all the desk drawers for evidence.

¶ 12　The parties submitted a stipulation in lieu of testimony for Officer Stephen Baldwin. The stipulation revealed Officer Baldwin was the first officer on scene and was met by Ms. Boaz, neither of whom could get into the office. The top half of the door was broken and would not unlock, so force was used to open the door. The female victim was in a chair in the corner, unresponsive, and covered in what appeared to be blood on her face and chest. Broken glass and blood were also noted on the floor. Once the officer gained entry, Officer Sarah Kilton and Decatur Fire and Ambulance arrived.

¶ 13　The State called Officer Kilton, who testified that she was dispatched to the location after being advised there was a domestic dispute, and someone had possibly been stabbed. She testified as to the broken glass and blood found at the location and seeing Adelle in the chair covered in blood and moaning. The officer took digital photographs of the injuries and Adelle told her that her husband stabbed her. The officer testified that she also interviewed Adelle at the hospital and took additional photographs at that time. She identified the photographs taken. On cross-examination, the officer testified that she was unaware of any black marks or shoe prints on the door to indicate it had been kicked.

¶ 14　The following day, the State called Assistant Chief James Wagoner, who testified about the speeds obtained during the pursuit of defendant's vehicle into Moultrie County. He further testified that defendant was calm when the chase ended. The State called Detective Jeremy Appenzeller, who testified about the blood in defendant's vehicle and his photographs of the vehicle. The detective went to Moultrie County to take defendant to the Decatur police station and

5

noted defendant had several small lacerations on his right index finger and abrasions to his shins, which were photographed. He stated that defendant complained of swelling in his hands. The detective seized a white tee shirt and shoes from defendant and those items were submitted to the Illinois State Police (ISP) for analysis. The detective interviewed defendant and booked him into the jail once they arrived at Decatur police headquarters.

¶ 15    The parties submitted a second stipulation in lieu of testimony regarding the testimonies of Randy Betzer, Cory Formea, and Rhonda Carter. The document stated Officer Betzer delivered the evidentiary items to the ISP crime lab. The items consisted of defendant's shirt and shoes as well as a DNA sample from Adelle. The stipulation indicated that Cory Formea would testify that the shirt and shoes contained blood and Rhonda Carter would testify that the blood on those two items was from Adelle Small.

¶ 16    The State called Tina Reel, a registered nurse at St. Mary's Hospital emergency room, who testified about Adelle's condition upon admission, stating she was covered in blood, her left eye was swollen shut, and she had lacerations on the back of her head and her chin. She also had small lacerations to her right elbow, right knee, and her pinky finger. Adelle received staples and a tetanus shot at St. Mary's and was transferred to Carle Hospital for further treatment. On cross-examination, the nurse testified that the laceration to the back of the head was approximately four centimeters in length on the left occipital lobe area. She did not know how deep the cut was. The chin laceration was two-three centimeters. No measurements were taken for the cuts on her the finger and elbow. Thereafter, the State rested.

¶ 17    The defense moved for a directed verdict on count I, which was denied. Thereafter, defendant testified that he filed for divorce due to missing money and Adelle cheating on him. He stated that on the day of the incident, Adelle told him to come to the business to pick up the

6

remainder of his belongings. They met outside the business and Adelle gave him the belongings. Thereafter, Adelle started yelling and screaming at him. After putting the bag of clothes in the car, he went into the office and continued to argue with Adelle. He testified that Adelle pulled a five- or six-inch knife on him and they tussled with the knife and his finger was cut. He testified that he "threw some punches" at Adelle that landed on her nose and shoulder and the window was broken while they were tussling. He testified that they separated, and he grabbed her hand with the knife and Adelle punched him. He then either head-butted or punched Adelle; she fell backwards and dropped the knife. When she dropped the knife, he shoved everything off the desk and jumped out the window. He testified that he was never in possession of any knife and never stomped on Adelle's face. He jumped in his car and took off. He averred that he tried to use his phone, but the SIM card was "messed up." He stated he did not know where he was going but wanted to get away from there and the police got him in Sullivan. He stated that he never drove faster than normal, he consented to the interview with Detective Atkinson, and he received the wounds on his legs jumping from the window.

¶ 18     On cross-examination, defendant testified that he did not run from Adelle when she pulled out the knife because he was afraid she would stab him in the back. He did not report the incident to the police because his phone would not work due to the SIM card; however, the phone later began working. He stated he was speeding away from the police because he had an app on his phone with a police scanner and heard there was a BOLO (be on the lookout) for him for murder. He stated that he had no idea how Adelle cut the back of her head; he did not cut or punch her on the back of the head. Adelle's eye was swollen because he punched her, but he did not know what caused the abrasions on her forehead or the lacerations on Adelle's chin, elbow, forearm, or finger.

On redirect, defendant testified that he observed no injuries on Adelle when he left the business. Thereafter, the defense rested.

¶ 19    Following closing arguments, the court first addressed defendant's claim of self-defense and found defendant not credible for "a number of reasons." It further found the State proved beyond a reasonable doubt that the defendant was not acting in self-defense and defendant "committed the acts which caused injuries to the victim."

¶ 20    The court next addressed defendant's state of mind. It noted the use of a "rather large hunting knife," the "number of blows struck," the stomping and stabbing or slicing, the extent of injury, amount of force, and the photographs of the victim's injuries. The court further found the victim's testimony credible regarding the cut on her chin stating:

"The Court finds it credible when she explains that she was not facing him at the time, he was pulling on her hair. She was trying to fend him off and avoid getting her throat slashed. She curled up to keep the knife from cutting her neck and, at that moment in time, the evidence shows that the defendant in performing the act of cutting her [on the chin] actually intended to do more than that. *** [H]is intent, at least in that moment of time, was to kill her. The rage subsided at some point, but at that point there was the intent to kill beyond a reasonable doubt. Then we have the defendant's statements *** which is probably some of the best evidence that the Court can ever have regarding someone's state of mind. All of the other lacerations and injuries demonstrate beyond a reasonable doubt that the defendant knowingly caused bodily harm to the victim. And again, it's clear from the evidence that, at [least at] one point in time during this encounter, the defendant had the intent to kill the victim. It's clear from the evidence, it's uncontradicted that there was severe bodily injury. The Court will not make the finding regarding exceptionally brutal and heinous indicative

8

of wanton cruelty. Yes, it was brutal; yes, it was heinous, but in the great spectrum of things, not especially exceptional. So having said that, the Court finds as follows: As to Counts 1 and 2, Court finds the defendant's guilt has been proved beyond a reasonable doubt. Judgment entered on the finding."

¶ 21    Sentencing was scheduled for July 9, 2015. On July 8, 2015, defense counsel filed a motion to set aside the verdict, enter a verdict of not guilty, or order a new trial. On July 17, 2015, defense counsel advised the court that he had not spoken to his client because defendant refused to speak to him and orally moved to withdraw. Defendant advised the court that he filed a motion for ineffective assistance of counsel and the State indicated a *Krankel* hearing was necessary. See *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 22    Defendant's motion for ineffective assistance of counsel was filed on July 21, 2015. The pleading alleged that defendant had not seen or heard from his attorney during the eight months prior to trial, defense counsel did not go over the police report, and he and his family attempted to contact defense counsel with no response until counsel spoke with him for half an hour on May 14, 2015, and again on May 15, 2015, prior to the trial. Defendant further alleged that he provided counsel with a list of questions to ask the witnesses, advised counsel of important information on Facebook, and provided a list of witnesses he wanted to call at trial. Finally, he alleged defense counsel was ineffective by failing to obtain pictures of the clothes in the car, failing to place his police interview tape into evidence, allowing a witness to lie on the stand, and stating that defendant went "too far" during closing argument. The pleading claimed that defense counsel's ineffective representation led to his loss at trial.

¶ 23    On July 23, 2015, the trial court held an informal *Krankel* hearing and thereafter found defendant's claim lacked merit and only pertained to matters of trial strategy. The court also denied

9

counsel's motion to withdraw. Defendant advised the court he did not want to speak with his counsel prior to the sentencing hearing. Following a brief recess, defense counsel argued his motion to set aside the verdict, which was denied.

¶ 24 The court then held the sentencing hearing and stated the one-act, one-crime doctrine did not apply. The State argued that because defendant inflicted severe bodily harm, any sentence for the attempted murder count was mandatory consecutive to his Moultrie County sentences for aggravated fleeing and aggravated domestic battery. Defense counsel confirmed the mandatory consecutive requirement. After clarifying that defendant was sentenced to three years at 50% in the Illinois Department of Corrections for aggravated fleeing in Moultrie County, the court sentenced defendant to seven years on the attempted murder count and six years on the aggravated domestic battery count, with both at 85%, and each running consecutive to the Moultrie County sentence. Defendant was admonished of his appeal rights and stated he understood the appeal must be filed in 30 days.

¶ 25 On September 16, 2015, defendant filed a motion for order *nunc pro tunc* stating he was entitled to 408 days credit for time served. The motion was denied, and defendant appealed. The Fourth District dismissed the appeal for lack of jurisdiction. *People v. Small*, 2017 IL App (4th) 150943-U, ¶ 16.

¶ 26 On October 18, 2017, defendant filed a *pro se* postconviction petition stating his sixth amendment rights were violated by (1) ineffective counsel failing to file a direct appeal and (2) counsel's failure to raise self-defense arguments or address the victim's lies during the hearing. The pleading further argued that defendant's fifth and fourteenth amendment rights were violated by the trial court's failure to make an adequate inquiry into his *pro se* complaint for ineffective assistance of counsel and his attorney failed to raise the one-act, one-crime doctrine. On February

10

12, 2018, the trial court found defendant presented the gist of a constitutional claim and appointed counsel.

¶ 27    On November 17, 2018, an amended postconviction petition was filed claiming defense counsel was ineffective by: (1) failing to file a notice of appeal, (2) failing to pursue defendant's affirmative defense of self-defense, (3) failing to file a motion on victim's propensity to commit acts of violence on defendant or inquire into this issue on cross-examination, (4) failing to challenge the court's one-act, one-crime doctrine conclusion, (5) only meeting with defendant four times to discuss the case, (6) failing to keep defendant informed of the proceedings until four days before the trial, (7) forcing defendant to waive his right to jury trial, and (8) failing to challenge the trial court's assessment that defendant's sentence was to run consecutive to the Moultrie County conviction.

¶ 28    On January 28, 2019, the State moved to dismiss the amended petition. With regard to each claim the State argued that (1) defendant's appeal rights were protected because he was granted a forum in the current action to appeal, (2) counsel's failure to raise affirmative defense was trial strategy, (3) counsel's failure to file a motion on propensity or inquire on cross-examination was trial strategy, (4) counsel's failure to challenge the trial court's determination on one-act, one-crime had no merit because the counts did not involve the same physical act, (5) failure to keep defendant informed was addressed at the prior *Krankel* hearing, (6) insufficient meetings was addressed at the prior *Krankel* hearing and the communication was found sufficient by the court, (7) defendant was admonished regarding the waiver of jury trial and his waiver was knowing and voluntary, and (8) challenge to the consecutive sentence had no merit because the conviction in Moultrie County was based on the same event, involved defendant's flight following his attack on Adelle, and was based on the finding of severe bodily injury.

11

¶ 29    On March 22, 2019, the trial court issued an order finding defendant failed to make a substantial showing of a violation of his constitutional rights, found no evidentiary hearing was necessary, and granted the State's motion to dismiss. On April 26, 2019, the trial court determined defendant was requesting a notice of appeal be filed, which was effectuated on May 2, 2019. On May 16, 2019, the Fourth District Appellate Court granted defendant's motion for leave to file late notice of appeal. The court's disposition was issued on March 29, 2021, and found defense counsel's failure to file a direct appeal was sufficient to find a substantial showing of a constitutional right violation based on the presumption of prejudice supplied by *People v. Ross*, 229 Ill. 2d 255, 261-62 (2008). *People v. Small*, 2021 IL App (4th) 190275-U, ¶ 19. The court remanded the case back to the trial court for a third-stage evidentiary hearing. *Id.* ¶ 20.

¶ 30    On June 10, 2021, the trial court noted the remand for a third-stage postconviction hearing and appointed counsel for defendant. On March 28, 2022, postconviction counsel filed a memorandum in support of the amended postconviction relief addressing: (1) failure to file an appeal, (2) failure to pursue affirmative defense, (3) failure to pursue propensity of violence evidence, (4) failure to contradict one-act, one-crime doctrine, and (5) failure to address consecutive sentencing. The evidentiary hearing occurred on August 1, 2022. Testimony was provided by Sean Marshall, Cynthia Marshall, and defendant.

¶ 31    Sean Marshall testified that he was longtime friends with defendant and acquainted with Adelle. He stated that he witnessed Adelle's violence on defendant, provided details of the events, and stated Adelle was on drugs at the time of the incident. Cynthia Marshall's testimony was similar. Both testified that defense counsel did not contact them, and if he had, they would have testified for defendant. Defendant testified consistent with his allegations of ineffective assistance.

12

Following testimony, both parties presented argument and the court took the matter under advisement.

¶ 32    On June 10, 2022, the trial court issued an order finding that defense counsel's failure to file a notice of appeal constituted ineffective assistance and directed the clerk to file a notice of appeal. The order further found that the trial court addressed defendant's claim of self-defense and found the State proved beyond a reasonable doubt that Adelle's injuries were not the result of defendant's self-defense. The order found defense counsel's failure to call the Marshalls as witnesses was trial strategy, and because there were multiple acts involved and as charged, no argument regarding one-act, one-crime had merit and was not evidence of ineffective counsel. The order further found that defense counsel's communication with defendant was previously addressed at the *Krankel* hearing and defendant knowingly and voluntarily waived his right to a jury trial following admonishment by the trial court. Finally, the trial court found that defense counsel's failure to challenge the consecutive sentences was not ineffective assistance because the court found severe, serious bodily injury and sentenced defendant consecutively. Defendant timely appealed.

¶ 33                                  II. ANALYSIS

¶ 34    On appeal, defendant contends the State failed to prove he was guilty of attempted murder beyond a reasonable double because the evidence was insufficient to prove he intended to kill Adelle. Defendant also contends both convictions should be vacated because defense counsel had a *per se* conflict of interest, his aggravated battery conviction should be vacated because it was based on the same act as the conviction for attempted murder, and his sentence for aggravated battery was improperly ordered to run consecutive to the Moultrie County conviction despite

13

neither conviction acting as a triggering offense. In response, the State urges affirmation of the first three issues and concedes defendant's argument regarding the consecutive sentence.

¶ 35                          A. Sufficiency of the Evidence

¶ 36    "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found, beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), and *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000)). "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *People v. Cline*, 2022 IL 126383, ¶ 25. The judgment will not be reversed "unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id*.

¶ 37    "To sustain a conviction for attempted murder, the State must establish beyond a reasonable doubt: (1) defendant performed an act constituting a substantial step toward the commission of murder, and (2) defendant possessed the criminal intent to kill the victim." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. Here, defendant claims the State failed to show intent to kill.

¶ 38    Intent is a state of mind that "can rarely be proved by direct evidence"; however, "where intent is not admitted by the defendant, it can be shown by surrounding circumstances [citation], including the character of the assault and the nature and seriousness of the injury [citation]." *People v. Williams*, 165 Ill. 2d 51, 64 (1995). " '[I]ntent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life.' " *People v. Green*, 339 Ill. App. 3d 443, 451 (2003) (quoting *People v. Winters*, 151 Ill. App. 3d 402, 405 (1986)).

14

¶ 39    Here, defendant repeatedly told Adelle that he was going to kill her. This assertion was incorporated with defendant brandishing a hunting knife. Further, while standing behind Adelle, defendant grabbed her hair, pulled her head back, and brought the knife around to the front of Adelle's neck.

¶ 40    Under these facts, it is not difficult to infer that defendant's actions were an attempt to slice Adelle's throat which was only thwarted by Adelle cringing and trying to push away the knife resulting in a sliced chin and finger. Nor does defendant's lack of success undermine his intent. See *People v. Fleagle*, 129 Ill. App. 3d 298, 302 (1984) ("The fact that the victim "successfully prevented consummation" does "not establish a lack of intent to rape."). Further evidence of intent is seen by defendant's later words telling Adelle to "take [her] last breath" as he stomped on her face while she laid on the floor. It is equally relevant that defendant's attack only ended after Adelle played dead on the floor. Against these facts, the trial court could readily have found, beyond a reasonable doubt, that defendant intended to kill Adelle, and therefore, we find no merit to defendant's challenge to his attempted murder conviction.

¶ 41                              B. *Per se* Conflict of Interest

¶ 42    Defendant also argues that his convictions should be vacated and the case remanded for a new trial because his defense counsel had a *per se* conflict of interest. Defendant's claim is based on defense counsel's appearance on behalf of the State in a prior case. The issue of whether a *per se* conflict exists presents a question of law that is reviewed *de novo*. *People v. Fields*, 2012 IL 112438, ¶ 19.

¶ 43    The Illinois Supreme Court "has identified three situations in which a *per se* conflict of interest will be found: '(1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel

contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved with the prosecution of defendant.' " *People v. Green*, 2020 IL 125005, ¶ 24 (quoting *Fields*, 2012 IL 112438, ¶ 18). Defendant claims the third situation is applicable because defense counsel "was a former prosecutor who was personally involved in the prosecution of [defendant] in a prior case that was used as impeachment evidence against him in this case."

¶ 44 Defendant acknowledges that a court previously determined that "a *per se* conflict of this nature exists only when defense counsel was also a prosecutor in the *same case*" (emphasis in original), citing *People v. Alexander*, 2019 IL App (4th) 170425, ¶ 21. However, defendant claims *Alexander* is distinguishable because there was no evidence that the prior case was "related in any way to defendant's current prosecution." *Id.* ¶ 23. Here, the admission of the prior conviction was used as impeachment evidence in the current case.

¶ 45 "A *per se* conflict of interest exists when specific facts about the defense attorney's status, by themselves, create a disabling conflict." *People v. Yost*, 2021 IL 126187, ¶ 39. "Generally, a *per se* conflict arises when defense counsel has a connection to a person or entity that would benefit from an unfavorable verdict for the defendant." *Id*. While the facts in the case at bar and *Alexander* are different, we do not find the difference so compelling to classify them as distinguishable.

¶ 46 In *Alexander*, counsel was appointed from the public defender's office. *Alexander*, 2019 IL App (4th) 170425, ¶ 5. It was later determined that defense counsel was previously an assistant state's attorney in a 2005 case in which defendant was charged with 14 counts of residential burglary and burglary. *Id*. ¶ 7. In the 2005 case against defendant, defense counsel appeared on behalf of the State at both a status hearing and when defendant pled guilty to four counts of residential burglary. *Id.* ¶¶ 7, 8. A motion *in limine* was filed to exclude the other crimes evidence

16

which was granted by the trial court after determining any convictions prior to 2009 were " 'too remote.' " *Id.* ¶ 10. When addressing the alleged *per se* conflict, the court relied on the fact that defense counsel did not contemporaneously represent the defendant and any of the State's witnesses who were called to testify as was seen in *People v. Hernandez*, 231 Ill. 2d 134 (2008). *Alexander*, 2019 IL App (4th) 170425, ¶ 19. Nor did defense counsel ever perform the duties of a prosecutor in the same case as seen in *People v. Kester*, 66 Ill. 2d 162 (1977). *Alexander*, 2019 IL App (4th) 170425, ¶ 21. The court found no *per se* conflict because defense counsel "was never involved in the prosecution of defendant *in this criminal proceeding*." (Emphasis in original.) *Id.* ¶ 21. The same can be said of the case at bar because defense counsel was never involved in the prosecution of defendant *in this criminal proceeding*.

¶ 47   It is apparent from the record that defense counsel appeared on behalf of the State at defendant's arraignment hearing in a prior case on December 19, 2008. There is no evidence that defense counsel was involved thereafter in defendant's plea agreement in the prior case or had a "connection to a person or entity that would benefit from an unfavorable verdict for the defendant" (*Yost*, 2021 IL 126187, ¶ 39) while representing defendant in the case at bar. Nor can we find that submission of the prior case, as impeachment evidence in the case at bar, brings the matter into the realm of a *per se* conflict, especially when defense counsel merely attended an arraignment hearing, did not prosecute the prior case, was never a prosecutor in the current case, and defendant privately retained defense counsel as his attorney in the matter at bar. As such, we decline to find a *per se* conflict in this matter.

¶ 48                    C. One-Act, One-Crime Doctrine

¶ 49   Defendant also argues that his aggravated domestic battery conviction and sentence should be vacated based on the one-act, one-crime doctrine. Under the one-act, one-crime doctrine, "a

17

defendant may not be convicted of multiple offenses based on the same physical act." *People v. Almond*, 2015 IL 113817, ¶ 47. In determining whether a one-act, one-crime violation has occurred, the court first determines whether defendant's conduct consists of one physical act or several acts. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). An "act" is defined as "any overt or outward manifestation that will support a separate offense." *People v. Crespo*, 203 Ill. 2d 335, 340-41 (2001). If there is only one physical act, multiple convictions are improper. *Rodriguez*, 169 Ill. 2d at 186. If defendant committed multiple acts, the court should then determine whether any of the charged offenses are lesser included offenses of another charged offense. If there are lesser included offenses then "multiple convictions are improper; if not, then multiple convictions may be entered." *Id*. Whether a conviction violates the one-act, one-crime doctrine is a question of law that is reviewed *de novo*. *People v. Artis*, 232 Ill. 2d 156, 161 (2009).

¶ 50    Defendant concedes the one-act, one-crime doctrine was not raised in the trial court but requests relief under the plain-error doctrine. The plain-error doctrine allows a court to grant relief in two circumstances: (1) "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence" and (2) "where the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Violations of the one-act, one-crime doctrine are reviewed under the second prong of the plain-error doctrine. *Artis*, 232 Ill. 2d at 167-68.

¶ 51    Here, contrary to defendant's argument, multiple acts were both charged and proven. Count I of the information charged defendant with attempted murder and alleged that defendant, "without lawful justification and with the intent to kill Adelle Small, repeatedly cut Adelle Small with a knife and stomped on her face" while threatening to kill her. The trial court's statement found intent based on the large hunting knife used, the force used, defendant's attempt to slash the

18

victim's throat resulting in the victim's chin laceration, and defendant's statements at the time of the incident. Count II of the information charged defendant with aggravated domestic battery and alleged defendant "struck" and "repeatedly cut Adelle Small with a knife, causing a finger fracture and multiple lacerations" which required medical stitches and/or staples to close." Following the hearing, the trial court noted "[a]ll of the other lacerations and injuries demonstrate beyond a reasonable doubt that the defendant knowingly caused bodily harm to the victim. *** It's clear from the evidence, it's uncontradicted that there was severe bodily injury." The trial court's finding was supported by evidence revealing that, in addition to the cuts on her chin and the back of Adelle's head, the victim incurred two black eyes, a sliced forearm, a pinky finger slashed to the bone, and additional cuts on Adelle's elbow. Adelle also testified that she still has not regained feeling in her finger.

¶ 52     Defendant claims the one-act, one-crime doctrine applies because the State failed to distinguish between the various cuts and all instances of stabbing. In support, defendant relies on *People v. Crespo*, 203 Ill. 2d 335, 342-45 (2001). In *Crespo*, both the aggravated battery (great bodily harm) and aggravated battery (deadly weapon) were based on defendant stabbing the victim with a knife. *Id.* at 343. Although three stab wounds were incurred, the State never argued that only one of the stab wounds was sufficient to sustain the charge. *Id.* at 344. Rather than allow the State to change its theory on appeal, the court found it was possible the jury found that all three stab wounds together constituted great bodily harm and would not have considered any one of the wounds sufficient to constitute great bodily harm by itself. *Id.* Based on the language of the charging instruments, the court found it was the State's intent "to treat the conduct of defendant as a single act" because the State failed to apportion the crimes among the stab wounds before the trial court and reversed defendant's aggravated battery convictions. *Id.* at 345-46.

19

¶ 53    Here, no such failure is seen. The trial court found that defendant's use of the knife to try to slash Adelle's throat was evidence toward the first count. The also court found that "[a]ll of the other lacerations *and injuries* demonstrate beyond a reasonable doubt that the defendant knowingly caused bodily harm to the victim." (Emphasis added.)

¶ 54    The element of "serious bodily injury" is only relevant to count II for aggravated domestic battery. 720 ILCS 5/12-3.3(a) (West 2014). "[T]he trial court is presumed to know the law and apply it properly." *People v. Howery*, 178 Ill. 2d 1, 32 (1997). Here, the record reveals the trial court's finding of serious bodily harm was not based on defendant's attempt to slash Adelle's throat; the finding was based on the other lacerations (which would include the slash to the bone seen on Adelle's finger) and other injuries, including those obtained from either defendant's admitted head-butting or punching of Adelle.

¶ 55    Contrary to defendant's argument, the charging instruments, evidence, argument, and conclusions of the trial court all support separate acts. Accordingly, we hold the one-act, one-crime doctrine was not violated.

¶ 56                              D. Consecutive Sentences

¶ 57    Finally, defendant argues that the trial court erred by ordering the aggravated domestic battery sentence to run consecutive to defendant's sentence in Moultrie County case No. 14-CF-28, where neither conviction was a triggering offense. The State agrees.

¶ 58    The statute provides for permissive and mandatory consecutive sentences. 730 ILCS 5/5-8-4(c), (d) (West 2014). When a defendant is convicted of a triggering offense, the sentence for that offense must run consecutively to any other sentences that the defendant is to serve; any sentence for nontriggering offenses must be served concurrently with one another. *People v. Curry*, 178 Ill. 2d 509, 539-40 (1997). Here, neither the Moultrie County sentence nor the aggravated

20

battery sentence in Macon County were triggering offenses. Nor did the trial court find that a consecutive sentence was necessary to protect the public as required for a permissive consecutive sentence. See 730 ILCS 5/5-8-4(c)(1) (West 2014). Accordingly, we vacate the trial court's order requiring defendant's Moultrie County sentence to run consecutively with the Macon County sentences and modify the sentence to order defendant's aggravated battery sentence to run concurrent with defendant's Moultrie County sentence.

¶ 59                                    III. CONCLUSION

¶ 60    For the foregoing reasons, we affirm defendant's convictions and modify the aggravated battery sentence to run concurrent with defendant's Moultrie County sentence.


¶ 61    Affirmed as modified.